381 P.2d 726

**R. S. McKNIGHT, Plaintiff,**

**v.**

**STATE LAND BOARD, Defendant,
Erving Wolf, Intervenor.**

No. 9728.

Supreme Court of Utah.

May 17, 1963.

C. M. Gilmour, Salt Lake City, for plaintiff.

A. Pratt Kesler, Atty. Gen., Ronald N. Boyce, Asst. Atty. Gen., Salt Lake City, for defendant.

Sheridan L. McGarry Salt Lake City, for intervenor.

NELSON, District Judge.

This is a review by certiorari of the lawfulness of a decision of defendant, the State Land Board, denying plaintiff's applications particularly as to priority, for oil and gas leases on certain state lands, and awarding such leases to Erving Wolf, Intervenor, as a prior applicant.

The jurisdiction of the Court to review the decision is based upon its original jurisdiction to issue writs of certiorari as conferred by Section 78-2-2, U.C.A.1953, Article VIII, Sec. 4, of the Constitution of Utah, and Rule 65B(b), (2), (3) and (g), upon the alleged grounds that defendant as an inferior tribunal or board has exceeded its jurisdiction, abused its discretion and has not regularly and lawfully pursued its authority as conferred by the laws of the State of Utah.

The facts pertinent to the issues of this case, as disclosed by defendant's findings of fact, the transcript of testimony and the exhibits received in evidence are summarized as follows:

State Mineral Lease No. 3548, issued January 2, 1952, containing 703.40 acres in Section 36, T. 11 S., R. 25 E., S. L. M.,

State Mineral Lease No. 3783, issued January 2, 1952, containing 640 acres in Section 32, T. 15, S., R. 19 E., S. L. M., and State Mineral Lease No. 3782, issued January 2, 1952, containing 640 acres in Section 36, T. 15 S., R. 19 E., S. L. M., all expired on Feb. 1, 1962. Under the law, February 2, 1962, became a one day simultaneous filing period for new applications for oil and gas leases covering the land included in the aforesaid three expired mineral leases. (Findings 1–7).

On February 2, 1962, Erving Wolf, Intervenor, filed three separate applications for mineral leases covering said lands under applications numbers 19120, 19140 and 19141. (Finding 8).

On March 1, 1962, R. S. McKnight, plaintiff herein filed three applications with the State Land Board applying therein for oil and gas leases on the three tracts of land upon which the prior applications, numbered 19120, 19140 and 19141 had been filed.

Formal hearing before defendant, under the authority of Section 65–1–9 and 10, U.C.A.1953, was conducted March 22, 1962. Bryant H. Croft, Esq., a member presiding. Thereafter the defendant, on June 14, 1962, concluded and adjudged that Erving Wolf, Intervenor, was entitled in preference and priority to plaintiff to the issuance of oil and gas leases covering the state lands in question.

14 Utah 2d—16

Joseph Sherman, R. J. Hollberg and Paul S. Callister also filed on one or all of the land covered in applications Nos. 19120, 19140 and 19141 and were given priority over plaintiff, but each one has either withdrawn his application or has failed to perfect the same. This limits the action to the plaintiff and the defendant and the Intervenor, herein.

In its Findings entered June 14, 1962 the defendant stated:

"9. * * * Each of three applications filed in the name of Erving Wolf on said tracts were on obsolete application forms; each had been signed in blank prior to February 2, 1962 by Erving Wolf in the presence of Miles A. Williams, a duly authorized Notary Public for the State of Utah; each had been filled out on February 2, 1962 on behalf of Erving Wolf by Miles A. Williams or his employee, Veiness Jones; and each was notarized by Miles A. Williams in the following words: 'Subscribed and sworn to before me this 2nd day of February, 1962, at Salt Lake City, Utah.'"

"10. Erving Wolf was not in Salt Lake City, Utah on February 2, 1962; he did not subscribe and swear to said applications on said date; but he did confer with Miles A. Williams by telephone at various times on said date

about various lease applications including those described above.

"11. Each of the three applications filed by Erving Wolf, namely application numbers 19120, 19140, 19141 were each deficient in the following particulars:

a. They were not on current forms provided by the State Land Board.

b. They did not include an offer to accept all of the requirements of the provisions of Title 65, Chapter 1, Utah Code Annotated, 1953, as amended, governing the issuance of oil and gas leases and operations thereunder.

c. They were not accompanied with a statement under oath, over the applicant's signature, of his qualifications as an Applicant for Oil and Gas Leases as defined in Section 65-1-87 and as required by Section 65-1-88, UCA, 1953 as amended."

The defendant further stated in the Findings of Fact:

"26. On March 1, 1962, R. S. McKnight, 220 Atlas Building, Salt Lake City, Utah; filed three applications with the State Land Board applying therein for oil and gas leases on the same three tracts of land upon which the prior applications, numbered 19120, 19140, 19141, of Erving Wolf, Joseph Sherman and R. J. Hollberg, Jr. had been filed.

"27. The applications of said R. S. McKnight were complete and not deficient as to form in any particular."

Defendant considered that Erving Wolf, Intervenor, was the high bidder and gave him a period of ten days from receipt of letter dated June 25, 1962, within which to file corrected applications for oil and gas leases without loss of priority and with the corrected applications to retain the original filing date of February 2, 1962. Wolf filed applications on July 3, 1962, for oil and gas leases of the lands in question dated July 2, 1962, which applications were accompanied by a statement under oath of his qualifications under the Act, to-wit: that on July 2, 1962, he was a citizen of the United States, and which applications also included his offer to accept all of the requirements of the Act.

Plaintiff claims he was the first qualified applicant to apply for oil and gas leases on the State lands here involved. He maintains the State Land Board correctly found that the Erving Wolf applications filed February 2, 1962, were deficient for the reasons stated in its Findings, but asserts the legal conclusion reached by the Land Board that the deficiencies in Wolf's

applications, "may be corrected by amendment or completion" and that if done within ten days after notice they "shall retain their original filing time" is clearly contrary to the statute which specifically provides (1) that oil and gas lease applications *"must* be accompanied * * * with a statement under oath over the applicants signature of his qualifications as required by this Act" and (2) that such leases "shall be issued to the applicant first applying for the lease who is qualified to hold under this Act."

The plaintiff admits the amendments may be made within the time allowed by the Department but he claims such application can only take effect and be regarded as filed from the date of such amendments.

To determine if the plaintiff is correct in his contentions it is necessary for us to examine the statutes governing herein and the applicable rules of the Land Board adopted by it to implement and apply the statutes.

The Statute involved states:

"65-1-86, Oil and gas leases—Mineral interests—Provisions of act controlling—No oil and gas leases of land or mineral interests belonging to the state of Utah shall be made or issued from and after the effective date of this act except in the form and manner provided by this act; * * *."

"65-1-87. Qualifications of applicants for oil and gas leases.—Oil and gas leases shall be issued only to applicants therefor who at the time of filing application and at the time of acceptance of application for lease by the state *are either citizens of the United States, or associations of such citizens, or corporations organized under the laws of the United States or any state or territory thereof: * * *.*"

"65-1-88, Applications for oil and gas leases—Royalty—Determination of average production.—Except as otherwise provided by section 65-1-45, Utah Code Annotated 1953, as amended by this act, oil and gas leases in units not exceeding 640 acres or one section, whichever is larger, shall be issued to the applicant first applying for the lease who *is* qualified to hold a lease under this act. Applications for lease shall be on forms to be provided by the state land board and shall include applicant's name, address and offer to accept all of the requirements of this act. Applications *must* be accompanied by payment of the filing fee and rental for the first year together with a statement under oath over applicant's signature of his qualifications as required by this act. Applications filed by an attorney in fact acting in behalf of the applicant shall not be accepted unless there is sufficient evi-

dence on file with the land board that the applicant authorized the attorney in fact to apply for and execute the lease on his behalf. * * *" (*underlining* added)

The State Land Board based and justified its action on Rule 6 of the Board's Rules and Regulations. Rule 6 provides as follows:

"Applications for mineral leases will be received for filing in the office of the State Land Board during office hours. Except as hereinafter specifically provided, all such applications received, whether by U. S. Mail or by personal delivery over the counter, shall be immediately stamped with the exact date and time of filing. All applications presented for filing at the opening of the office for business on any business day shall be stamped received as of 8:30 A.M. of that day. In the same manner all applications received in the first delivery of U. S. Mail of each business day shall be stamped received as of 8:30 A.M. of that day. The time indicated on the time stamp shall be deemed the time of filing unless the Director shall determine that the application is deficient in any particulars. *If an application is determined to be deficient, it shall be returned to the applicant with the instructions for its amendment or completion. If the application is resub-mitted in satisfactory form within the time specified in the instructions, it shall retain its original filing time. If the application is resubmitted at any later time it shall be deemed filed at the time of resubmission.*" (italics added).

There is no question but the deficiencies in Intervenor's applications were corrected within the time specified in the Land Board's instructions. The question remaining then is whether the corrected applications shall retain their original filing date or will such applications take effect and be regarded as filed from the date of such amendments.

First let us consider whether the rules and regulations of the State Land Board were so repugnant to the statute as to be contradictory or irreconcilable therewith. It is axiomatic that the rules and regulations of an administrative agency must conform to rather than be contrary and inconsistent with statutory law. Courts usually will not override an administrative agency's interpretation of its own rules unless the interpretation is obviously arbitrary or erroneous.[1]

We have held "the whole matter of making disposition of the state's land was placed in the hands and under the control of the State Land Board. No right of appeal to the Courts, or of reviewing the Board's actions otherwise, by the Court, ex-

1. Bowles v. Mannie & Co., 155 F.2d 129 (C.C.A., Ill.).

cept where lack of or excess of power is alleged, has been given. All the courts can do, therefore, is to inquire into and determine in a proper proceeding whether the Board has acted without or in excess of its powers or jurisdiction, Courts may not review the acts or conduct of the Board, for the purpose of correcting mere irregularities."[2]

This leads to the conclusion that rules are only prohibited when they nullify or waive the provisions of statutory law. We think the law is well stated as it appears in 42 Am.Jur., Public Administrative Law, Sec. 101:

"Rules made in the exercise of a power delegated by statute should be construed together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason. The same rules of construction which apply to statutes govern the construction and interpretation of administrative rules and regulations. If it can fairly be done, the rule should be construed and applied as to make it conform to the powers conferred upon the administrative body, rather than as being an assumption of power not conferred."

■■ We find Rule 6 is not inconsistent with Section 65–1–88, U.C.A.1953. The Land Board has full power and authority to prescribe necessary and proper rules and regulations to accomplish its purposes and objectives as set out by statute. In administering the Act, the Board exercises such a discretionary, rather than a ministerial function. The provisions of the Act clearly indicate that the Legislature had in mind the distinction between a positive mandate to the Board and a permissive right to take certain actions in its discretion. Under this power it was the duty of the Board in this case to determine the person who was first to make application for the lease of the property in question. It is likewise apparent the language "person first making application" is not so certain, particularly in light of previous experiences by the Board, as to render an interpretative or implementing regulation wrong or inappropriate.[3]

Plaintiff bases his opposition to the Board's ruling on the following grounds: 1. Intervenor's applications were on obsolete rather than on current forms furnished by the Board. 2. The applications were defective because they did not include an offer to accept all of the require-

---

2. Whitmore v. Candland, 47 Utah 77, 151 P. 528 (1915); Miles v. Wells, 22 Utah 55, 61 P. 534; Safarik v. Udall, 113 U.S. App.D.C. 68, 304 F.2d 944 (1962); Zarraga v. Texas Co., 3 Cir., 284 F.2d 657 (1960).

3. Thor-Westcliffe Development, Inc. v. Udall, D.C.Cir., 314 F.2d 257; United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 51 S.Ct. 414, 75 L.Ed. 1148.

ments of the Act. 3. Applications were defective because they did not include statements of applicant's qualifications under oath.

■ As to objection 1, it surely cannot be successfully contended that an application on paper other than a form issued by the Board, but meeting all the requirements of the Act and conforming to the rules of the Board, would not be acceptable. The furnishing of forms, it appears, is only a service rendered by the Board for the accommodation of applicants. The forms are not inviolable. We do not hold, however, that an applicant would be relieved from complying with the Act and the rules because it was prepared and submitted on forms furnished by the Board. It is binding on the applicant to comply with the law regardless of any form that may be used. In this case the form first used by the Intervenor was furnished by the Board, but it was obsolete and insufficient. It was necessary to have what is designated, "current form" prepared. The current form was used in the amended return as well as by plaintiff in his applications. We find this objection to be superficial and not well taken.

Plaintiff contends that where the original application does not contain a statement that applicant offers to accept all the requirements of the Act, the application can be later corrected, but such correction will not give it the priority of the original date of filing.

■ With respect to this provision the only difference in the original application and the amended application was that in the amended form these words appear: "If a lease is granted the lessee, will be subject to all the provisions of the laws of the state of Utah governing the issuance of oil and gas leases and operations thereunder." In the original application it read "If a lease is granted the lessee agrees to commence active mining operations not later than December 31 of the year following" etc. Considering the language and the purpose of the statute as well as the experience of the Board, in the implementation of the act, we conclude and rule that the Board's action in permitting amendment of the applications to show lessee's intention and pledge to obey and be subject to all the provisions of the laws of the state of Utah governing oil and gas leases, was under Rule 6 correct and proper. It was an exercise of a directionary power. We further hold that Rule 6 is valid and is consonant with the statute in question.[4]

■ It is the claim of plaintiff the provision that "Applications must be accompanied * * * with a statement under oath

4. Carlson v. Real Estate Commission, 38 Hawaii 9; Davis, Administrative Law Treatise, Sec. 5.03, 42 Am.Jur., Public Administrative Law, Sec. 101.

over applicant's signature of his qualifications as required by this Act" is mandatory and to preserve date of priority it must be included in the original application. He argues that application must be rejected with loss of priority if it fails to comply with a mandatory requirement of the statute. The reason for such a position is an offeror who does not comply with a mandatory requirement is not a qualified applicant at least until such requirement has been met.[5] He argues this provision has to do with substance rather than procedure.[6]

The original application of Erving Wolf as to qualification reads: "The undersigned being first duly sworn deposes and says that he *is over the age of 21*." The amended application in place of the statement about age reads that he is "*A citizen of the United States*." (italics added)

It appears from a reading of the statute and the Land Board Rules, that an applicant who is a citizen of the United States at the time of filing the application and at the time of the acceptance thereof is qualified to hold a state oil and gas lease provided he meets other specified requirements. Plaintiff has so admitted for his application is the same as Intervenors amended application. Plaintiff claims, however, that even though Intervenor was qualified he could not be considered as the one first to qualify unless his original application would show on its face that he was a citizen at the time of its filing.

No objection was made by plaintiff at the time he filed his application that Intervenor was not a properly qualified applicant. No evidence was offered to show Erving Wolf was not a citizen of the United States on February 2, 1962. No issue or question was raised as to whether Intervenor was a United States citizen on July 2, 1962. Both the original and the amended applications were on forms prepared by the State Land Board. While we do not hold that if the original form was defective and such defect was corrected by the later form an applicant would be relieved or excused of his responsibility or any requirement imposed by law, we do hold that an interpretation of an application still rests with the Land Board, and if the original application would meet the legal requirements with some amendment for clarification, it could so order and the applicant would retain his standing as to priority.

There seems to be no question that Erving Wolf was a qualified applicant, in that he was a United States citizen on February

---

5. Celia R. Kammerman, 66 I.D. 255 (1959); c. McKay v. Wahlenmaier, 96 U.S.App.D.C. 313, 226 F.2d 35.

6. Cf. McKay v. Wallenmeier, 96 U.S.App. D.C. 313, 226 F.2d 35 (CADC 1955); Madison Oils, Inc. et al., 62 I.D. 478 (1955); Walls v. Evans, 38 Wyo. 103, 265 P. 29 (1928); State v. Martin, Tex. Civ.App., 347 S.W.2d 809.

2, 1962 and also on July 2, 1962. If there was doubt, and an issue on this point were raised, the evidence would not be limited to the application, but any other competent evidence could be received. Where no issue was raised, the Land Board could well conclude the applicant met the requirement. It is argued the real question is whether his application showed him to be a citizen of the United States. With this we do not agree; the real question is whether he was at the time of filing such a citizen; the Land Board found he was and that his standing as to priority was maintained as of February 2, 1962. We sustain the Board's ruling.

A more serious question raised by plaintiff is whether the oath taken by the Intervenor was valid.

We have held:

To constitute the taking of an oath, there must be definite evidence that the affiant was not only conscious that he was taking an oath, but there must be some outward act from which that consciousness can be definitely inferred, which cannot be done from the mere signature to a printed form of oath.[7]

The outward acts in this case were as follows: It is true Wolf was not in Salt Lake City on February 2, 1962. It is true that Intervenor did not subscribe to his applications on that date. It is true he signed the applications on a day prior to February 2, 1962. It is true he conferred at various times by phone from Denver with Miles A. Williams, a Notary Public, about various lease applications, including those hereinbefore referred to. There is no question as to the authenticity of Intervenor's signature. There was an understanding between Wolf and Williams that Williams would fill in accurate descriptions of the property to be leased on the applications. From these facts the Land Board held the oath valid.

An oath is a solemn attestation of the truth or inviolability of what is said to one legally authorized to acknowledge affiant's signature and declaration.

An oath is a pledge the security of which is found in the character, integrity and fidelity of the declarer. While we do not favor the making or taking of an oath by phone or when the one taking it is not in the presence of the officer giving it, we do not think the facts in this case would justify holding the oath given to Wolf invalid.

The officer administering the oath is under no obligation to know the veracity of the declaration, nor is he required to

7.  Spangler v. The District Court of Salt Lake County, 104 Utah 584, 140 P.2d 755.

know for a certainty that the signer is the person he represents himself to be, but he is required to know and state the person who took the oath did declare himself to be the person mentioned in the oath, and that he manifested an intention to be bound by it.

▮▮▮ The purpose of an oath is to avoid a violation of a pledge or promise. It is to become secure against profanation or corruption, or breach. In its broadest sense the term "oath" is used to include all forms of attestation by which one signifies that he is bound in good faith to perform what is demanded by the oath faithfully and truly. It does not include those forms of the attestation which are not accompanied by an imprecation.[8]

▮▮▮ There are several types of oaths given for different purposes. A promissory oath binds the party to observe a certain course of conduct, or to fulfill certain duties in the future, or to demean one's self thereafter in a stated manner with reference to specified objects or obligations.[9]

More attention is given to the manner of taking the oath when perjury may have been perpetrated. It is possible for a false statement to constitute false swearing and not perjury.[10]

8. Vaughn v. State, 146 Tex.Cr.R. 586, 177 S.W.2d 59, 60.
9. Case v. People, 76 N.Y. 242, 6 Abb.N.C. N.Y., 151; People ex rel. Bryant v. Zimmerman, 241 N.Y. 405, 150 N.E. 497, 499, 43 A.L.R. 909.

▮▮ The essentials of an oath are:

1. A solemn declaration.

2. Manifestation of an intent to be bound by the statement.

3. Signature of declarer.

4. Acknowledgment by an authorized person that oath was taken.

The administration need not follow any set pattern. The ritual is of secondary importance and does not affect the validity of the oath. The manner of delivery may add to the solemnity, but nothing to the honesty of the declarer. A former President of the United States took an oath in an isolated village by candle light. His oath was as valid as others given with a great show of magnificence or brilliant display of elegance.

The Land Board's finding on this point is sustained.

▮▮▮ There is one final point to which we must give our attention and consideration. It is claimed by the plaintiff that one of the applications filed by the Intervenor (Exhibit A) at the hearing before the Land Board was deficient in an additional respect. A Mrs. Vennes Jones testified that after it

10. Weadock v. State, 118 Tex.Cr.R. 537, 361 S.W.2d 757, 762; United States v. Howard, D.C., 132 F. 325, 338.

had been notarized by Miles A. Williams she, under his direction, and at the request of the Intervenor, changed what was found to be a wrong description to what was considered the right description of the lands to be leased. She stated she "changed it to a different Township and Range and changed the acreage." It is argued by plaintiff that if the application had been properly sworn to in the first place the oath should have been readministered.

We do not agree with the plaintiff if the particular land to be leased was the land actually understood by the Land Board and the Intervenor was the land leased, even though this land had not been accurately described and correct description was made. It is our observation that this was the finding and conclusion of the State Land Board and such decision should stand. It could have been otherwise if there had been no meeting of the minds as to exact land to be leased.

The decision of the defendant, State Land Board, is affirmed, and the Writ of Certiorari heretofore issued is vacated.

HENRIOD, C. J., and CROCKETT and WADE, JJ., concur.

McDONOUGH, J., concurs in the result.

CALLISTER, J., having disqualified himself, did not participate herein.