E. Keith LIGNELL, Marian H. Lignell, his wife, and Burton M. Todd and Phyllis W. Todd, his wife, Plaintiffs and Appellants,

v.

Clifford M. BERG and William R. Berg, a partnership, dba Berg Brothers Construction Company and Frank C. Berg, an individual, a joint venture, dba Berg Construction Company and Fidelity and Deposit Company of Maryland, a corporation, Defendants, Respondents, and Cross-Appellants.

Hendrick COPINGA et al., Plaintiffs and Cross-Respondents,

Claron Bailey, Third Party Plaintiff and Cross-Respondent,

v.

E. Keith LIGNELL et al., Defendants.

MURRAY ELECTRICAL SERVICES, INC., et al., Plaintiffs and Cross-Respondents,

v.

Clifford M. BERG et al., Defendants.

No. 15001.

Supreme Court of Utah.

March 22, 1979.

802

Earl D. Tanner, of Earl D. Tanner & Assoc., Wilford A. Beesley, Richard H. Nebeker, Salt Lake City, for plaintiffs and appellants.

Joseph S. Knowlton, David K. Smith, Salt Lake City, for defendants, respondents, and cross-appellants.

MAUGHAN, Justice:

Appellants Lignell and Todd ("Owners") appeal from a judgment entered against them in favor of Berg Brothers Construction Company (BBC) on BBC's counter-claim. The litigation was commenced by the Owners against their general contractor. The contract involved was for construction of the Incline Terrace condominium complex in Salt Lake City. BBC was not the entity identified as the "contractor" in the formal contract; that contract identifies as the contractor a joint venture composed of BBC and Respondent Frank C. Berg.

The Owners sued the joint venture alleging financial damage from the joint venture's failure to complete the work on time, failure to pay for labor and materials, and defective workmanship. BBC counter-claimed alleging it (rather than the joint venture) was the general contractor in fact, and that the Owners had breached the contract to BBC's damage by interfering with the work, by failure to make progress payments, and by failure to pay for extra contract work ordered by Owners and performed by BBC or its subcontractors.

While the Owner-BBC litigation was in progress, two of BBC's subcontractors sued BBC seeking payment for work performed and materials supplied for the complex. Both a performance bond and a labor and material payment bond having been obtained for the job, the surety, Respondent Fidelity and Deposit Company of Maryland, was joined as party defendant in all the actions.

The cases were consolidated for trial over the Owner's objection. All issues except those relating to interest and attorneys' fees were submitted to a jury. The jury found by special verdict "the contractor was not estopped to deny it was a joint venture." The jury's verdicts also awarded the subcontractors a combined $104,346.69 on their claims against BBC and the surety, and awarded BBC $159,148.68 on its claim against the Owners. The Owners were found by the jury to have no cause against BBC. The court then made findings and conclusions pertinent to the interest and attorneys' fee issues, entered judgment awarding interest on all money judgments from the date the money became due (as established by the evidence in the case); and further awarded to the prevailing parties attorneys' fees totalling $74,000.00. The subcontractors' attorneys' fees and all interest charges ordered to be paid by BBC were treated by the trial court as damages from the Owners' breach. The attorneys' fees of BBC and its surety were treated by the court as recoverable from the Owners under Sec. 14–2–3, U.C.A., 1953. The end result was the Owners were ordered to pay all the attorneys' fees of all the prevailing litigants.

We affirm, but modify as to attorneys' fees directly awarded BBC, and the surety. We do not disturb the award of attorneys' fees to BBC as damages. All statutory references are to U.C.A., 1953. Costs awarded to BBC and its surety.

The appeal raises the following seven distinct issues:

1. Whether there is evidence to support the verdict against Owners and in favor of BBC.

2. Whether certain exhibits were improperly received without foundation.

3. Whether a judgment of any kind in favor of BBC is proper in litigation on a contract to which BBC was not a party.

4. Whether BBC is precluded from recovering for work performed as a general contractor, because it was not licensed as a general contractor at the time of contract execution or during performance.

5. Whether the trial court's consolidation of the subcontractors' actions against BBC with the Owners' action was reversible error.

6. Whether BBC and its surety were entitled to recover from the Owners their own attorneys' fees and the attorneys' fees recovered by subcontractors' against BBC in the consolidated action.

7. Whether interest was properly assessed against and added to the verdict amounts.

We treat the issues in the order stated.

1. *The evidence supports the verdict.*

The jury was given eight instructions as to damages, and none is challenged on appeal. The primary damage instruction directed the jury to determine the amount due from the Owners to BBC or vice versa by (1) determining the price the Owners agreed to pay for work under the original contract and all written and oral addenda or change orders less the amount contemplated to have been charged for work covered by the contract but not performed by BBC, and (2) subtracting from the amount so determined the amount paid by Owners to BBC or for BBC to laborers, materialmen or subcontractors plus the costs of remedying defective work of BBC or its subcontractors.

Other instructions gave the jury considerable latitude to award BBC damages for unwarranted Owner interference with the contract performance and failure to make promised payments promptly, or at all. The jury may well have exercised that latitude in BBC's favor if, indeed, the proof was technically inadequate to support its award under the primary damages formula. The record does not indicate, however, that the proof was deficient in any particular. There is testimony to support the BBC contentions that $1,938,678.32 was promised to be paid for the work actually done by BBC, that only $1,179,529.68 of Owner outlay is properly to be credited against the debt, and that $159,148.68 (the amount of the BBC verdict against the Owners) remains to be paid.

■ To a large extent, the evidence about the Owners' promises consists of Clifford Berg's naked and controverted testimony about conversations with Appellant Lignell. The need to resort to such evidence is chargeable to the Owners, because they chose to proceed on the basis of frequent oral and undocumented modification of the plans and because they usurped general contractor authority. The total sum the jury found the Owners to have promised to pay[1] includes amounts which were promised only by implication. The Owners did not, for instance, expressly promise to pay the costs of bonding the job, or the amount (plus BBC's mark-up) by which cost of dry-wall or electrical subcontract work exceeded, because of Owner interference, original bids, or the costs entailed in revisions of structures to satisfy the Salt Lake City Building Department. As the jury was instructed, however, it was entitled to regard these costs as legitimate charges against the project to be absorbed by the Owners. The result does not do violence to established principles of equity and implied contract.

2. *Exhibits complained of were properly received.*

■ The Owners objected to Exhibit 210P (a summary of charges for "extras")

[1]. The jury's verdict is clearly an adoption of an Exhibit summarizing BBC's claims, and necessarily reflects jury findings in accordance with the evidentiary support for that exhibit.

on the principal ground that Clifford Berg, the witness through whom the exhibit was introduced, did not have personal knowledge of the details of charges for electrical extras.[2] Nevertheless, the electrical subcontractor had been a previous witness in support of his own claim against BBC. He had introduced exhibits and testified as to the details of the work for which payment was demanded. To the degree the entries on Exhibit 210P for electrical extras were not claimed to be the subject of oral agreement between the witness and Lignell, those entries do not purport to represent anything other than the amount BBC had been billed for the designated extras, a fact about which Berg had personal knowledge.

If the evidence showed any subcontractor charge for extra work should have been absorbed by the contractor, that evidence should have been emphasized to the jury on argument. The jury was instructed to be aware that subcontractor work which may have been outside the scope of the subcontract was not necessarily an extra in the context of the general contract. The only exhibit, other than 210P, critical to the jury's proper adoption of BBC's summary of amounts to be considered, in the damages formula, was Exhibit 234P which was received without objection. We find no error in the trial court's rulings on evidence.

3. *Judgment for BBC on its counterclaim was proper.*

■ While the formal contract executed by the litigants identifies a joint venture (BBC plus Frank Berg) as the "contractor," the evidence shows the designation of the joint venture as contractor was purely a device for satisfying the surety that its principals had sufficient net worth to justify the bond. The Owners made their original contract with BBC and clearly looked to BBC for performance. There is no evidence the Owners relied on Frank Berg's partici-

pation in performance, that they complained of his non-participation, or they ever regarded the joint venture as anything more than a fiction for the convenience of the surety. The jury specifically found BBC was not estopped to pursue its counterclaim as the de facto contractor, and the court, when it entered judgment, properly treated BBC as the real party in interest.

Without reference to the special verdict on the estoppel issue, BBC's assertion of its counterclaim as a joint venturer, under a contract between the joint venture and a third party, is not offensive to our rules of practice or to principles of joint venture law. Joint ventures are less clearly distinct from their components than partnerships, but the law of partnerships is commonly applied to them. The recognition even of a partnership as an entity distinct from its partners is a limited one.[3] Set-offs of severally liable partners have historically been assertable against claims by third parties against the partnership,[4] and our partnership act specifically provides "any partner may enter into a separate obligation to perform a partnership contract."[5] If, indeed, the contract in issue imposed the primary obligation of performance on a joint venture, it is clear from the evidence BBC, with the approval of the Owners, separately undertook to perform it; and has separate status to pursue its counterclaim where all the alleged joint venturers are before the court.

4. *BBC's unlicensed status does not preclude its recovery.*

■ The evidence clearly shows, at the times of BBC's execution and performance of the contract in issue, BBC was not licensed to engage in the business of contractor. It acted in that capacity, therefore, in violation of 58–23–1. Consequently, argue the Owners, BBC is without status to enforce the contract or resort to the courts on

2. Rule 19, Utah Rules of Evidence.

3. 60 Am.Jur.2d 212, Partnership, § 332 et seq.

4. See annotations at 5 A.L.R. 1549, 55 A.L.R. 566.

5. 48–1–12, U.C.A., 1953, as amended; § 15, Uniform Partnership Act annotated.

any theory to obtain recompense for its work.

This Court has had frequent occasion to comment on the status of unlicensed contractors, and has persistently construed the cited statute as having been designed to protect the public and consequently to bar recovery by unlicensed contractors for services rendered under their contracts.[6] The most recent Utah cases so holding are *Mosely v. Johnson*, 22 Utah 2d 348, 453 P.2d 149, and *Meridian Corp. v. McGlynn Garmaker Company*, Utah, 567 P.2d 1110. The rationale of those cases is, however, that the party from whom the contractor seeks to recover is in the class the legislature intended to protect. A litigant is not a member of that class if the required protection (i. e., against inept and financially irresponsible builders) is in fact afforded by another means.

In *Fillmore Products v. Western States Paving*, Utah, 561 P.2d 687, we adopted the point of view expressed by Professor Corbin,[7] viz., "the general rule" (of nonenforceability) is not to be applied mechanically but in a manner "permitting the court to consider the merits of the particular case and to avoid unreasonable penalties and forfeitures."

In this case, the denial of recovery to BBC would indeed impose unreasonable penalties and forfeitures, particularly because the Owners were never deprived of the kind of protection the licensing statute was designed to afford. We consider the following circumstances to be of controlling significance in this regard:

1. BBC has not failed to satisfy the licensing authority of its technical competence and financial qualification for license. It had inadvertently permitted its license to lapse. Restoration of licensed status involved no new demonstration of qualification, but only payment of fee.

2. The Owners did not rely on any BBC competence they inferred from BBC's having advertised itself as a general contractor. They had previously employed BBC as a builder in apartment house construction. Moreover, the Owners usurped the general contractor's prerogatives in constructing the Terrace Incline complex. They relied on their own competence.

3. BBC supplied a performance bond as well as a labor and material suppliers payment bond. The Owners were infinitely better assured of adequate and complete performance without financial exposure beyond the contract price than they would have been by BBC's mere compliance with the licensing statute.

■■ The question whether the defense of lack of license, in a suit by an unlicensed contractor, is waived unless raised in a responsive pleading becomes moot in this case. We concur with the Owners, however, that the proof must establish any claimant's standing to maintain his suit, and the issue of the claimant's lack of legal capacity may be raised before or during trial.[8] "License" as used in the rule is essentially synonymous with "consent." If the defending party contends he had the consent or license of the complaining party to do the acts complained of, he must assert that defense as Rule 8(c) provides. The facts establishing such license are peculiarly within the defending party's knowledge, and it is entirely reasonable he should be required to plead them. The facts establishing whether the complaining party has been issued a license by a governmental agency, on the other hand, are peculiarly within his knowledge and not his adversary's.

5. *The consolidation of the Owners v. BBC and subcontractors v. BBC actions was not error.*

The captioned actions were consolidated on Rule 42(a) motion of BBC and Frank Berg over the objection of the Owners. Owners do not now contend there were no

6. See annotation at 82 A.L.R.2d 1450.

7. Corbin on Contracts, Vol. 6A, Sec. 1512.

8. Rule 12(h), U.R.C.P.

issues of law or fact common to the actions. They contend the consolidation injected so many issues and required the receipt of so much evidence the jury became hopelessly confused. In particular, the Owners believe the jury was unable to distinguish between the standard of performance required of BBC by the general contract and the standard required of BBC's subcontractors by their subcontracts.

■ The authority to consolidate actions for trial is provided by the rules in the interests of efficient judicial administration. As is true of any other kind of judicial discretion, it is subject to abuse, and it is appropriate for us to remand for separate trials if it appears the prejudice to any litigant, from consolidation, far outweighed the benefit.[9]

■ In the case before us, a major fact issue in each of the consolidated actions was whether work had been performed on the condominium complex for which payment was due. The Owners complain BBC did not extend itself to defeat the claims of its subcontractor against it (on the grounds their work was defective, for instance), because BBC would, to the degree it showed subcontractor work to be defective, be defeating its own counterclaim against the Owners. We cannot see, however, that BBC's dilemma would be of less magnitude if the actions were separately tried. In no circumstances could it be in BBC's self-interest to demonstrate that its subcontractors' work on the complex was deficient by the standards of the general contract. BBC and its subcontractors formed a natural alliance in the defense of their work product against the Owners' attack.

Nor do we see, because of consolidation, the issues became so numerous or the claims so involute as to exceed a jury's capacity for comprehension.[10] It was necessary for the jury to understand that the standards of work quality required by the general contract might be higher than those required by the subcontracts. Subcontractor recoveries against BBC would not, therefore, automatically justify BBC recovery against the Owners. The jury was instructed on the point, and the Owners do not now quarrel with the instruction. Nothing about the verdicts suggests that the jury was confused, or that any confusion associated with the double standard concept would be alleviated by separate trials.

### 6. The judgment as it relates to attorneys' fees must be modified.

The issues of law and fact related to the award of attorneys' fees were reserved on agreement of counsel for resolution by the court. The court found BBC, the surety, and the subcontractors to be successful parties, within the meaning of Title 14, Chapter 2 of our code and consequently entitled to recover their attorneys' fees under 14–2–3. The attorneys' fees of the subcontractors, as recovered by them from BBC and the surety, were treated by the court as consequential damages flowing from the Owners' breach of their agreement with BBC. The end result was all attorneys' fees of all litigants became the Owners' burden.

The Owners raise a number of issues, with respect to the propriety of the court's action, but they do not question the *amount* of any fee awarded. They contend (1) the action in which BBC and the surety prevailed was not an action on the bond required to be provided by 14–2–1, but upon an entirely separate bond which is not statutorily required, and (2) the actions in which the subcontractors prevailed were not actions as to which the Owners were even parties, the Owners having prevailed in all actions by the subcontractors directly against the Owners. The code chapter on bonding of private construction contracts reads in its relevant portions:

9. See discussion in *Garber v. Randell*, 477 F.2d 711, C.A.2d (1973) on the nature of trial court discretion and the basis on which a party aggrieved by consolidation may seek immediate appellate review.

10. In *Raggenbuck v. Suhrmann*, 7 Utah 2d 327, 325 P.2d 258, we upheld consolidation of 11 actions.

14–2–1. Bond to protect mechanics and materialmen.—The owner of any interest in land entering into a contract, involving $500 or more, for the construction, addition to, or alteration or repair of, any building, structure or improvement upon land shall, before any such work is commenced, obtain from the contractor a bond in a sum equal to the contract price, with good and sufficient sureties, conditioned for the faithful performance of the contract and prompt payment for material furnished and labor performed under the contract. Such bond shall run to the owner and to all other persons as their interest may appear; and any person who has furnished materials or performed labor for or upon any such building, structure or improvement, payment for which has not been made, shall have a direct right of action against the sureties upon such bond for the reasonable value of the materials furnished or labor performed, not exceeding, however, in any case the prices agreed upon; which right of action shall accrue forty days after the completion, or abandonment, or default in the performance, of the work provided for in the contract.

The bond herein provided for shall be exhibited to any person interested, upon request.

\* \* \* \* \* \*

14–2–3. Action on bond to protect mechanics and materialmen—Attorney's fee. —In any action brought upon the bond provided for under this chapter the successful party shall be entitled to recover a reasonable attorney's fee to be fixed by the court, which shall be taxed as costs in the action.

To the degree that any party was "successful" in an action upon the bond required by section 1, he was properly awarded attorney's fees under section 3 against his adversaries in that action.

The evidence in this case shows two separate and distinct bonds were simultaneously written by the surety. The first is designated a "Labor and Material Payment Bond" (herein "payment bond"), and was written specifically to protect laborers and materialmen who contributed to the Incline Terrace structures. The second is designated a "Performance Bond" and was written to assure the Owners (who were already protected against assertions of labor and materialmen's liens and lien claims) they would get what they bargained for in their contract with BBC. It is significant that neither the contract nor the performance bond treats the subject of attorneys' fees.

Without question, Section 1 requires that a payment bond be obtained. The chapter was enacted for the protection of laborers and materialmen.[11] It benefits the owners of property being improved only in the sense that, by complying with its provisions, they are freed from construction lien exposure. The bond requirement for private contracts was first imposed in 1915, and the relevant statutory language has not since materially changed. In 1917 (*Rio Grande Lumber Co. v. Darke*, 50 Utah 114, 167 P. 241) this Court identified the evil at which the legislation was aimed.

The aim and purpose of our mechanic's lien law manifestly has been to protect, at all hazards, those who perform the labor and furnish the materials which enter into the construction of a building or other improvement. The result has been that the owner of the premises, at whose instance and for whose benefit the improvement is made, has been the one most likely to suffer loss. He pays at his peril the original contractor, who generally needs it and demands it as the work progresses. If he does not reserve enough of the fund in his own hands to pay for the labor of subcontractors and employees, and the price of materials, he incurs the risk of having to pay over again for at least a part of these items. The original contractor, as in this case, often defaults, with his compensation

---

11. *DeLuxe Glass Co. v. Martin*, 116 Utah 144, 208 P.2d 1127; *Crane Co. v. Utah Motor Parks*, 8 Utah 2d 413, 335 P.2d 837.

overdrawn and with subcontractors, employees, and materialmen unpaid. The owner of the premises suffers in consequence because his property is pledged for the payment of these obligations. This case is only one of many. In view of these facts and conditions, more or less prevalent, owing to the vast amount of building and improvement of various kinds going on in the communities of the state, is it manifestly unreasonable, harsh, or oppressive, or in contravention of any provision of the Constitution, for the Legislature to require by law, as it has done in this case, that every person who contemplates the erection of a building or structure, such as are mentioned in the statute, shall exact of his contractor, the person to whom he lets the work, a good and sufficient bond for the performance of his contract, the payment of laborers and materialmen, and, upon his failure to procure such bond, that he himself shall pay the unpaid bills and accounts? Can it be said that this is even an unreasonable regulation, much less a violation of the Constitution? The purpose and object is for the protection of all parties concerned, except the original contractor, who, as experience has demonstrated, has less need of protection than any one else concerned in the business.

Only laborers and materialmen are afforded a statutory right of action against the surety. In view of the language of the entire chapter, including the headings, and the treatment the chapter has been given in the literature of this Court, the phrase "faithful performance of the contract and payment for material furnished and labor performed" must be interpreted to limit legislative concern to the faithful performance of the contract as it relates to the contractor's payment of his laborers, materialmen, and subcontractors. The chapter has never been construed to require of owners that they patronize bonding companies beyond the guarantee of payment for labor and materials. The promotion of bonding companies' business in performance bonds has never been an identified public objective.

The evidence in this case is that the insistence upon a performance bond as a condition of a construction money loan to Owners caused severe consternation to and was recognized as extraordinary by the parties. They restructured their contract to accommodate the requirement. They did not regard the performance bond as falling within the scope of Section 14–2–1.

■ It follows, from the foregoing discussion, 14–2–3 does not provide a basis for the award of either BBC's or the surety's attorneys' fees against the Owners. The Owners' action against BBC was not an action on any bond, it was an action on the contract. The Owners' action against the surety was not an action on the payment bond, but on the performance bond. Neither the contract nor the bond provides for payment of the prevailing party's attorneys' fees, in the event of litigation, and no statute authorizes such an award. The judgment must therefore be amended to delete the awards of attorneys' fees, for BBC and the surety.

■ The award of attorneys' fees to the parties who were suing on the payment bond was of course fully justified by the statute. On the court's findings, it was appropriate to treat those fees as damages to BBC from the Owners' breach of contract.[12]

The payment bond provides the "owner shall not be liable for the payment of any costs or expenses" arising from suits by beneficiaries of the bond, to obtain payment for materials or labor supplied to the project. However, the trial judge found the subcontractors' suits on the bond to have been necessitated by a course of owner conduct, which went beyond the contemplation of the parties at the time the bond was issued. The essence of the Owners' breach of the general contract was they wrongfully undertook to hire, fire, directly pay, and give direct instruction to materialmen and subcontractors. Having assumed

---

12.  22 Am.Jur.2d 235, Damages § 166.

those contractor prerogatives, they assumed as well the consequences of decisions, including refusals to pay subcontractors. This violated subcontractors' rights. Except for such Owners' decision, no subcontractors' attorney fees would have been incurred. The language of the bond, set out above, was intended to insulate the owner from consequences of BBC's failure to satisfy obligations to subcontractors, not to protect them against their own failures.

### 7. The evidence supports the trial court's awards of interest.

The trial court awarded interest on the jury's verdict amounts based on its own findings as to the facts relevant to the interest issue. The Owners now challenge the propriety of the court's findings on the grounds (1) the interest issue was not reserved by the court, and Owners were entitled to jury determination of all facts which would influence the award, (2) the jury's verdicts were inclusive of any interest factor and (3) the court's finding as to the due date of the amount awarded to BBC is contrary to the construction contract.

■ In contract cases, certainly, interest on amounts found to be due in judicial proceedings is recovery to which the creditor is entitled as a matter of law. Before the turn of the century, the U.S. Supreme Court so held in *Young v. Godbe*, 15 Wall. 562, 21 L.Ed. 250, *Atlantic Phosphate v. Gafflin*, 114 U.S. 492, 5 S.Ct. 967, 29 L.Ed. 221, and *Crescent Mining Co. v. Wasatch Mining Co.*, 151 U.S. 317, 14 S.Ct. 348, 38 L.Ed. 177 (appealed from a decision of the Utah territorial court reported at 5 Utah 624, 19 P. 198). This Court has never deviated from the doctrine, and has applied it in situations where the interest component of the award has been viewed as consequential damages (*Fell v. Union Pacific R.R.*, 32 Utah 101, 88 P. 1003) and as implied promise (*Progressive Music Supply, Inc. v. McKean*, 30 Utah 2d 203, 515 P.2d 616).

■ Once the amount due and the due date have been ascertained, interest computation is simple arithmetic. In this case, the court applied an interest rate of six percent, the statutory legal rate, from due date to judgment date. In the absence of agreement of the parties, the rate could not be less than six percent,[13] and circumstances might dictate the use of a higher interest rate.[14] The Owners can have no complaint about the rate of interest or the amount on which it was charged; they can only have meritorious complaint about the due date used by the court in its computation. The due date is the only fact relevant to the interest award which was not determined by the jury. The Owners contend *all* facts relevant to the interest issue are for jury determination, because the issue was not reserved for resolution by the court.

■ We find nothing in the record on appeal to show any issues, except those relating to attorney fees, were reserved for resolution by the court. Nevertheless, the interest issue is injected by law into every action for the payment of past due money. Any litigant may demand the interest issue, or any other fact issue, be submitted to the jury on special interrogatory under Rule 49, U.R.C.P. If he fails to do so, however, he waives his right to trial of that issue by jury, and the court may make a finding consistent with the jury verdict.[15]

■ The real question with regard to the interest component of the judgment is whether the due date found by the court is consistent with the evidence. The construction contract provides for the Owners' retention of ten percent of the contract price until the construction is completed "to Pacific Mutual's satisfaction" and "free and clear of liens or claims which might result

---

13. *Child v. Child*, 8 Utah 2d 261, 332 P.2d 981.

14. The legal rate is set by Sec. 15–1–1 at six percent, but Secs. 70A–3–118, 122 of the Utah Commercial Code provide (for example of statutory deviation) that, unless the instrument otherwise provides, interest on commercial paper runs at the rate provided by law for a judgment.

15. The Owners propounded over 50 special interrogatories, but none on the specific interest question.

in liens." The trial court found that by February 1, 1974, all claims which might result in liens had been paid. If there is substantial evidence to support that finding, it will not be disturbed on appeal. The evidence is that, by the time of closing on February 1, 1974, the Owners had paid all claims which might result in liens or had satisfied Pacific Mutual by fund deposit. So far as the contract language is concerned, it doesn't matter who paid potential lien claimants; once they were paid and the project completed, the final payment to BBC became due. The claims of Claron Bailey and Western Drywall had not of course, been paid at the time of closing, but those claims were judicially determined to have been asserted too late to result in liens. On the interest issues, the evidence supports the findings, and the findings support the court's conclusions.

The Owners' contention the jury verdict included interest is totally unsupported by the record. The trial court was fully justified in adding interest to the jury verdicts.

ELLETT, C. J.,* CROCKETT and WILKINS, JJ., and JOHN F. WAHLQUIST, District Judge, concur.

HALL, J., does not participate herein.

---

* Chief Justice ELLETT had acted in this case before his retirement, December 31, 1978, other factors resulted in its delayed release at this time.