**PACIFIC CHROMALOX DIVISION, EMERSON ELECTRIC COMPANY, Plaintiff and Appellant,**

v.

**Richard F. IREY, Industrial Engineering and Manufacturing Corporation, and John Does I through V, Defendants and Respondents.**

No. 880203–CA.

Court of Appeals of Utah.

Feb. 12, 1990.

---

Timothy W. Blackburn and Ron R. Kunzler, Ogden, for plaintiff and appellant.

Ephraim H. Fankhauser, Salt Lake City, for defendants and respondents.

Before BENCH, GARFF and ORME, JJ.

GARFF, Judge:

Appellant Pacific Chromalox Division, Emerson Electric Co. (Chromalox) brought an action against respondents Richard F. Irey (Irey) and Industrial Engineering and Manufacturing Corp. (I.E.M.) for breach of contract and breach of warranty. Respondents counterclaimed for breach of contract

and unjust enrichment. After a jury trial, the jury ruled in favor of respondents. We affirm.

Chromalox, a subsidiary of Emerson Electric, is a manufacturer of industrial heating elements which it sells to companies that produce heating equipment for commercial applications. It does not sell heating elements to residential customers. Irey, as the president and owner of I.E.M., designs and builds one-of-a-kind automated machines. I.E.M.'s staff includes Irey's wife, some machinists and assembly people, and some consulting engineers, including Joseph W. Lindsey.

During the summer of 1982, Chromalox's manager of manufacturing engineering, Ned Blackett, in response to corporate cost-cutting targets, was interested in reducing the cost of Chromalox's complicated, labor intensive process for producing heating coils. He did not know if it was possible to build a machine to automate this process, but was interested in the possible savings that might result if such a machine could be built. He first offered this "high risk" project to another company, which declined it. Blackett then heard about Irey's work in automation engineering and offered the project to him.

Irey visited the Chromalox facility, located in Ogden, Utah, and observed the coil production process. On about August 10, 1982, he hand-carried a proposal for the machine to Chromalox and met with Blackett. He told Blackett that he could build a machine to duplicate the process exactly. Blackett told Irey that he could not pay more than $75,000 for the machine because of corporate financial restrictions, but if the machine worked, Chromalox might be interested in a second machine for another plant, and that Chromalox had need of other types of automated machinery which Irey might be able to build.

On November 2, 1982, I.E.M., through Irey, agreed to manufacture the machine for Chromalox for $69,896 plus tax, with delivery to take place in fourteen to sixteen weeks. Irey arrived at this price by subtracting the requisite amount of sales tax from Chromalox's $75,000 ceiling. He deliberately underbid the project, which he figured would cost about $120,000 to complete, because he felt, on the basis of Blackett's representations that a second machine might be needed and that Chromalox was interested in additional automated machinery, that it was an investment in his future business. To meet the price ceiling, Irey and Blackett agreed to eliminate a washer orienter called for in the original specifications.

Blackett filed a purchase requisition for the machine on November 9, 1982. Specifications set forth in the purchase order included the following: The machine was to be capable of applying a stud on both ends of a heating coil, which could range in diameter from .06″ to .115″, at a minimum rate of 600 coils per hour. It was to accept coils made from twenty to thirty-two gauge wire, was to be designed and constructed for continuous service, and was to allow for convenient servicing and repairs. The purchase order specified a delivery date of February 1, 1983. I.E.M. was to test the machine at its facility prior to delivery. Chromalox was to pay I.E.M. fifty percent of the contract amount upon satisfactory completion of the machine, with the remainder due within thirty days.

I.E.M. did not begin production of the machine until after December 7, 1982, when Chromalox sent required documentation regarding some of the specifications. About this time, Blackett became aware that the previously eliminated washer orienting device might be necessary to duplicate the manufacturing process. He discussed the problem with Irey, who told him that it would not be any problem to put a little orienter mechanism on the machine. They did not discuss any price increase or extension of the delivery date for the machine.

On March 31, 1983, approximately sixteen weeks later, Irey delivered the uncompleted machine to Chromalox's facility at Blackett's request, because Blackett need-

ed to demonstrate it to "corporate people" from Emerson Electric. Irey indicated that it would take two to three weeks to complete the machine, but that it was to the point that he could complete it at Chromalox's plant. Because of its uncompleted condition, Chromalox did not pay for the machine at this time.

However, by April 1983, the machine was still not producing heating coil assemblies, and had numerous problems. First, the parties finally determined that addition of the washer orienter was necessary. Second, the washer dispenser on the machine continually jammed. Although Chromalox suggests that this problem was the result of Irey's poor design, Irey indicated that the washers supplied by Chromalox may have caused much of the problem: He stated that it is understood in the automation industry that you will get washers free from burrs, deformations, and dirt because an automated machine cannot handle nonidentical parts. Even though Chromalox's specifications stated that the washers used for production by the machine would be flat and free from burrs, they were not. Instead, they were nonidentical in shape and were mixed with bits of rock left from Chromalox's deburring operation. Consequently, Irey maintained that the problems encountered with the washer dispenser were a result of the poor quality of the washers. Finally, Irey and Chromalox engineers determined that it would be necessary to add a previously uncontemplated coil centering device to the machine. In its initial specifications, Chromalox had represented that the coils used on the machine would be manufactured to within plus or minus one coil diameter in length. However, the coils provided by Chromalox did not conform to this standard. According to Irey, the coil centering device was a necessary modification to compensate for Chromalox's lack of quality control, but interfered with the operation of the rest of the machine.

During the ensuing year, Irey continued to work part time, together with Chroma-

lox engineers, on the machine at the Chromalox plant. He spent a considerable amount of time on two unsuccessful attempts to design and install the washer orienter while Chromalox engineers constantly changed the specifications for the machine.

Although the machine was not operational during this period, never producing more than ten or twelve coil assemblies at a time, Chromalox paid Irey the total contract amount for the machine by October 4, 1983 because Irey was facing extreme financial pressures. Blackett told Irey that if the machine worked, Chromalox would be willing to pay I.E.M. an additional $30,000 for the design and engineering package as an attempt to compensate him for the additional engineering work.

On March 26, 1984, Blackett authorized the machine's return to I.E.M.'s facility in Salt Lake City for the purpose of refining the washer feeder and finding a way to orient the washers. During the ensuing ninety days, Irey again redesigned the washer orienter. However, the machine developed additional problems related to the washer feeder and washer orienter.

Irey returned the machine to Chromalox in June 1984, representing that it would produce about 250 parts per hour and that Chromalox could start training an operator. However, the machine continually jammed after producing only a few parts. Nevertheless, Chromalox trained two operators. One of them, Carolyn Cromwell, stated that she operated the machine on and off for about two months, that the machine only produced twenty-five coils per hour and seven coils in one sequence, and that it was always jamming and was under repair more than it was operational.

In October 1984, the parties decided to further modify the machine by adding another operation, cutting off the "pigtail" hook on the heating coils, which required the machine's return to I.E.M.'s facility. Blackett told Irey that he did not care what Irey did to the machine but that it had to produce 400 parts per hour to be accept-

able, and claimed that this request was simply for a modification of Irey's design, not a modification of the original specification.

The transfer order authorizing the machine's return to I.E.M., dated November 1, 1984, indicated that there was to be no charge for this work. Irey, however, testified that he had not seen or agreed to this order prior to the trial. On November 5, 1984, Chromalox shipped the machine to I.E.M.'s facility by common carrier. Because of Chromalox's admitted negligence, the machine was damaged during shipping. Robert Slater, a senior Chromalox engineer, went to I.E.M.'s facility, verified the damage, and authorized Irey to repair the damage and bill Chromalox for the $1,500 repair cost. Chromalox never paid for this repair, although Blackett alleges that he deducted it from expenses which Chromalox had incurred on Irey's behalf. Because Irey understood, from Blackett's comments, that he was to "go ahead" with the machine, he designed, extensively tested, and debugged a fourth washer orienter and installed it on the machine. Having done this, he videotaped the machine operating at the rate of 500 coil assemblies per hour, and with the assistance of his consulting engineer, ran timing tests which came out at 7.14 seconds per cycle, a rate of about 505 parts per hour.

In March or April 1985, Irey arranged for Chromalox representatives to come to the I.E.M. facility for a demonstration of the machine. Irey requested that they bring new coils for the demonstration because the old coils were bent and damaged from repeated testing. Chromalox representatives, however, forgot to bring the new coils, so Irey was forced to use the old, damaged ones for the demonstration. Consequently, the machine malfunctioned during the demonstration. However, one Chromalox representative, Slater, indicated that he watched the machine, which had undergone considerable changes, operate through its cycle for about ten minutes with the reclaimed coils, and stated that it

"looked excellent." He observed that the machine could be run at 400 parts per hour, but was unable to run 400 parts because Irey had insufficient coils to do so. He also testified that the additional parts put on the machine at Chromalox's request slowed it down, and that he was expecting to pay approximately $10,000 for the modifications to the machine. Blackett, however, stated that the machine would only cycle at a rate of 287 parts per hour and would break down after several minutes of operation.

Irey asserts that the changes and modifications Chromalox requested after March 31, 1983 required additional engineering and materials valued at $185,817. He states that this amount represents nothing but modifications, and he had subtracted out expenses for which he felt responsible. After the demonstration, Irey was willing to settle with Blackett for $52,000 for these changes, and demanded payment. In response, Blackett told Irey that Chromalox would not pay any more for the machine, that Chromalox owned it, and that Chromalox representatives would come and pick it up. He testified that Irey never billed him for the alleged modifications and that the only modification he requested was the washer centering device. He further alleged that Chromalox never accepted the machine as completed because it never functioned according to the specifications; that Chromalox had provided Irey with sufficient coils, washers, and bolts to complete and demonstrate the machine; and that Chromalox had paid Irey in full for the machine. Irey asserted a lien against the machine to secure payment of the amounts he claimed, and kept the machine.

On April 25, 1985, Chromalox sued respondents, requesting a writ of attachment on the machine. The court granted Chromalox's writ, and ordered that the machine should be taken from I.E.M.'s facility and stored in a storage unit under the control of the Salt Lake County sheriff. Respondents moved to quash the writ and answered Chromalox's complaint. On November

6, 1985, Chromalox filed an amended complaint, requesting the return of the machine, $81,868.87 in damages, reasonable attorney fees and costs, and $20,000 in punitive damages. Respondents asserted a counterclaim, demanding $186,817 in damages.

On February 5, 1986, Chromalox moved for summary judgment, raising the issue that Irey was prevented from seeking relief through Utah courts, pursuant to Utah Code Ann. § 58–22–20 (1963), because he was not authorized to practice as an engineer. Irey opposed the motion, indicating that Joseph Lindsey, a licensed professional engineer, had been on I.E.M.'s staff at all relevant times, and that Robert Griffin, also a licensed professional engineer, had done engineering work on the machine. The court denied Chromalox's motion.

A jury trial was held on November 17, 1987. The jury found in favor of Irey and awarded him damages against Chromalox of $92,500, accrued interest of $24,281, and costs of $649.75. On January 15, 1988, the trial court amended the judgment, awarding Irey $92,500, $23,895.91 in accrued interest, $285.45 in costs, and awarded possession of the machine to Chromalox. Chromalox brought this appeal.

The parties raise the following issues on appeal: (1) May respondents recover for breach of contract, given the engineering licensing provisions of Utah Code Ann. § 58–22–20 (1963); and (2) did the trial court commit reversible error by refusing to give Chromalox's requested jury instruction on breach of warranty?

I.

## ENGINEERING LICENSE

The major issue raised by the parties is whether, under the relevant provisions of the Engineers'- and Surveyors' Licensing Act, Utah Code Ann. § 58–22–1 to –22 (1963), respondents may recover for breach of contract.

Chromalox argues that section 58–22–20 bars I.E.M. from seeking any relief

through the courts because I.E.M., through Irey, practiced engineering in the state of Utah without a license. I.E.M., however, argues that it is not precluded from enforcing its contract because: (1) Chromalox is not a member of the protected class, the lay public, but rather, Chromalox is an industrial manufacturer which sells only to industrial and commercial users; (2) Irey believed that he was acting in compliance with the statute by hiring licensed engineers to work on the Chromalox project; and (3) there is evidence upon which the jury could reasonably conclude that the machine worked.

██  At the outset, we note that the record clearly indicates Irey practiced engineering in the state of Utah without a license. Relevant provisions of Utah Code Ann. § 58–22–2 (1963) define the practice of engineering as:

> the performance of any professional service or creative work requiring engineering education, training and experience, and the application of special knowledge of the mathematical, physical, and engineering sciences to such professional services or creative work as consultation, investigation, evaluation, planning, design, and supervision of construction for the purpose of assuring compliance with specifications and design, in connection with the utilization of the forces, energies, and materials of nature in the development, production, and functioning of engineering processes, apparatus, machines, equipment, ... employed in or devoted to public or private enterprise or uses.

Similarly, the term "practice of engineering" "comprehends the practice of those branches of engineering, the pursuit of any of which affects the safety of life, health or property, or the public welfare." Utah Code Ann. § 58–22–2 (1963). By designing and constructing the machine, Irey unquestionably engaged in creative work and professional services requiring application of the physical and engineering sciences. It is undisputed, also, that Irey was not li-

censed according to the terms of the statute. He held no other engineering license or college degree, and had not engaged in any formal engineering education.

Section 58–22–2 further states that:

> [a] person shall be construed to practice or offer to practice engineering, within the meaning and intent of this act, ... who holds himself out as able to perform, or who does perform any engineering service or work or any other professional service designated by the practitioner or recognized by educational authorities as engineering.

The evidence on the record warrants the inference that Irey held himself out as being able to perform certain engineering services, so, under this provision, he should be construed to have practiced engineering during the relevant times.

■ Utah Code Ann. § 58–22–21 (1963) lists the circumstances under which a practitioner might be exempted from the licensing requirement. The only arguably applicable exemption to the licensing requirement is contained in section 58–22–21(d), which states:

> This act shall not be construed to prevent or apply to ... The work of an employee or a subordinate of a person holding a certificate of registration under this act, or an employee of a person exempted from registration by this section; provided such work does not include responsible charge of design or supervision. . . .

The facts clearly establish that Irey was not merely an employee or subordinate of Lindsey, but that they collaborated on an equal basis, and that Irey had primary responsibility for design and manufacturing of the machine. Thus, this section is not applicable, and Irey is not exempt from the licensing requirement.

■ Because Irey practiced engineering as defined by the Act and is not exempted

from its provisions, he comes under its provisions, including section 58–22–20 which states, in relevant part, that:

> [n]o person shall bring or maintain any action in the courts of this state for enforcement of any contract or the recovery of any sums due in connection with the practice of engineering or land surveying in this state as defined herein, without alleging and proving that he was duly authorized to practice under the provisions of this act. . . . [1]

There is no Utah case law specifically interpreting this provision or other, similar provisions. However, the Utah Supreme Court has stated, regarding the status of unlicensed practitioners, that:

> [i]f the purpose of licensing is to protect the public, then the general rule in this State is that the party who does not obtain a license, but is required to do so, *cannot obtain relief to enforce the terms of his contract*—including payment thereunder—even though there are other penalties imposed against him expressly by statute including criminal sanctions.

*George v. Oren Ltd. & Assocs.*, 672 P.2d 732, 735 (Utah 1983) (quoting *Fillmore Prods., Inc. v. Western States Paving, Inc.*, 561 P.2d 687, 689 (Utah 1977)) (emphasis in original); *see also Heber Valley Truck, Inc. v. Utah Coal & Energy, Inc.*, 611 P.2d 389, 391 (Utah 1980); *Mosley v. Johnson*, 22 Utah 2d 348, 453 P.2d 149, 152 (1969); *Smith v. American Packing & Provision Co.*, 102 Utah 351, 130 P.2d 951, 957 (1942). This general rule was adopted in connection with licensing statutes which did not specifically provide, as does section 58–22–20, that an unlicensed practitioner cannot maintain an action in the state's courts to enforce the terms of his contracts. *See e.g., Loader v. Scott Constr.*

---

**1.** Under the new version of the comparable statute, "[a] person who is not licensed under the provisions of this chapter may not bring or maintain any action in the courts of this state for enforcement of any contract or the recovery of any sums due in connection with the practice of engineering ... in this state." This statute

was enacted by ch. 24, 1986 Utah Laws, effective April 28, 1986, which repealed the former sections 58–22–1 to –22 as enacted by ch. 118, 1955 Utah Laws. Because the events leading to this appeal occurred from 1982 to 1985, prior to the effective date of the new statute, the old version applies.

*Corp.*, 681 P.2d 1227, 1229 (Utah 1984). Because section 58–22–20 only states explicitly what the general rule has been held to be, we interpret the statute consistently with the case law which has developed under the general rule.

The general rule is not applied unconditionally, but only under circumstances in which the "party from whom the contractor seeks to recover is in the class the legislature intended to protect." *Lignell v. Berg*, 593 P.2d 800, 805 (Utah 1979); *see also George*, 672 P.2d at 735; *Heber Valley Truck, Inc.*, 611 P.2d at 391. The purpose behind taking this approach is to avoid unreasonable penalties and forfeitures which go, not to the state, but to repudiating defendants. *Fillmore Prods., Inc. v. Western States Paving, Inc.*, 561 P.2d 687, 689 (Utah 1977); *see also Loader*, 681 P.2d at 1229; *Heber Valley Truck, Inc.*, 611 P.2d at 391; *Lignell*, 593 P.2d at 805. Laws intended for protecting the public are not intended to become "an unwarranted shield for the avoidance of a just obligation," *Fillmore Prods.*, 561 P.2d at 690 (quoting *Matchett v. Gould*, 131 Cal.App.2d 821, 281 P.2d 524 (1955)) and should not allow a "defendant to take the benefit of an unlicensed plaintiff's labor and refuse to pay for it." *Heber Valley Truck, Inc.*, 611 P.2d at 391.

"A litigant is not a member of [the class the legislature intended to protect] if the required protection ... is in fact afforded by another means," *Lignell*, 593 P.2d at 805, such as the litigant being licensed in the same trade or profession as the unlicensed practitioner. *See e.g., Heber Valley Truck, Inc.*, 611 P.2d at 391–92; *Lignell*, 593 P.2d at 805; *Fillmore Prods.*, 561 P.2d at 689. In *Fillmore Products*, a licensed contractor who contracted for services with an unlicensed contractor was not allowed to invoke the general rule prohibiting the unlicensed contractor from initiating an action for payment because the unlicensed contractor's work had met all the requirements and specifications of the general contract and the entire project was under

the supervision of a licensed project engineer. *Fillmore Prods.*, 561 P.2d at 689; *see also Heber Valley Truck, Inc.*, 611 P.2d at 391–92. In *Loader v. Scott Construction Corp.*, the Utah Supreme Court found that the defendant from whom the unlicensed contractor demanded payment was a licensed contractor, so did not belong to the class of persons the general rule was intended to protect, the lay public, because he was presumed to possess expertise in the contracting business which would enable him to protect himself. *Loader*, 681 P.2d at 1229. Significantly, the defendant did not complain at trial that the unlicensed contractor's work was unsatisfactory, so the court assumed that the contractor's performance met the defendant's expectations. *Id.* Ultimately, the court found in favor of the unlicensed contractor because (1) the defendant was not a member of the class the statute was intended to protect, (2) the unlicensed contractor fully performed the contract and the defendant would be unfairly benefitted by avoiding payment, and (3) the unlicensed contractor's unlicensed status was the result of a good faith mistake. *Id.* at 1230.

This court will reverse a judgment based upon a jury verdict only if, "viewing the evidence in the light most favorable to the verdict, there is no substantial evidence to support it." *Canyon Country Store v. Bracey*, 781 P.2d 414, 417 (Utah 1989) (quoting *In re Estate of Kesler*, 702 P.2d 86, 88 (Utah 1985)). Where there is conflicting evidence, "we assume that the jury believed those facts that support its verdict ..., and we view the facts and the reasonable inferences that arise from those facts in a light most supportive of the jury's verdict." *Canyon Country Store*, 781 P.2d at 417 (quoting *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1082 (Utah 1985)).

In the present case, the Chromalox employees involved with the project were either licensed engineers or working under the direction of licensed engineers. Ned Blackett was a licensed engineer, as was Charles Ashburn, a manufacturing engineer who assisted Irey with design. Mark

Coy, the primary Chromalox engineer on the project, was an engineering student working under Blackett's direction. Under *Loader*, Chromalox is, thus, presumed to possess expertise in engineering so "is not in need of the protection the licensing statute was intended to provide to the lay public." *Loader*, 681 P.2d at 1229.[2] Although substantially controverted, the record further contains evidence from which the jury could conclude that the machine worked according to the required specifications as revised by Chromalox.[3] Likewise, although Irey was not in compliance with the licensing statute, the record contains evidence from which the jury could conclude that Irey was engaged in a good faith effort to comply with the statute. *See* footnote 2.

We conclude that Chromalox is not a member of the legislatively protected class and that, under these facts, preventing Irey from bringing his action against Chromalox would result in an unreasonable forfeiture. We, therefore, find that I.E.M. may recover for breach of contract under the provisions of section 58–22–20, and affirm the trial court's judgment.

## II. Jury Instructions

Chromalox demands reversal of the jury verdict, alleging that the trial court committed prejudicial error by excluding its requested breach of warranty instruction.

Chromalox's attorney submitted the following jury instruction, which the trial court declined to give:

> Under the written agreement entered into on November 2, 1982, the defendant specifically agreed to produce a machine for $69,896.00 plus sales tax, which would produce 400 accepted bolt to coil terminals of diameter .06 to .115", coil length of 2" to 48," [sic] from wire gauges from 20 to 32, continuous service, convenient servicing and adjustment and/or replacing of components. This agreement warrants and binds the defendant to make a machine which would accomplish these specific functions.
>
> In the event the defendant failed to produce a machine which would specifically meet each of the functions successfully, he would be in breach of his promise or warranty and the plaintiff would be entitled to its damages.

Instead, the trial court gave the following instruction, in relevant part:

> The plaintiff alleges defendant made them a written offer to build the plaintiff a machine that would do specific things

---

**2.** Although the focus under *Loader* is solely on whether the party refusing payment has the very expertise which the licensing statute is designed to insure, we note that the possibility of any actual harm in this case was also greatly minimized by the availability of engineering expertise to Irey. In addition to Chromalox's in-house expertise, several registered engineers worked on, approved, and certified the project design for I.E.M. Joseph W. Lindsey, a licensed engineer, regularly consulted with I.E.M. on various projects, including Chromalox's machine, prior to and during the manufacturing stages. He routinely reviewed Irey's designs and suggested whatever modifications he felt were required to make better use of the materials or to strengthen the machine. Although Lindsey was not an officer or employee of I.E.M., he was a stockholder, and was involved with the Chromalox project at virtually every step, spending about 140 hours on it. He worked on the preliminary design, the design of the frame, and the running of tests and analyses on the machine to assure that it was sound. He certified the machine design and contracted to have the machine built in his machine shop.

Irey also employed Robert M. Griffin, a registered professional engineer, to perform computations and stress analyses on the machine. Griffin testified that Irey's design was more than adequate and was capable of operating safely and reliably from a mechanical standpoint. Irey additionally engaged Robert Kirk, also a registered engineer, to design the computer and software packages.

**3.** We note here that

> [t]he question on appeal from a judgment based on a jury verdict is not whether there is substantial evidence which would have supported a contrary verdict, or even whether this Court, had it been trier of fact, would have reached the same verdict as that reached by the jury. Rather, the issue is whether the jury's findings are supported by substantial competent evidence.

*Canyon Country Store*, 781 P.2d at 418 (quoting *In re Estate of Kesler*, 702 P.2d 86, 95 (Utah 1985)).

in a set time frame. The plaintiff further alleges that the plaintiff accepted the written offer in writing and has, in fact, paid in full for the machine. The plaintiff alleges that defendant has had more time than a reasonable time to perform, and that the plaintiffs now have the machine and it is not as ordered and is in fact worthless. Plaintiffs therefore claim that they are entitled to have their monies returned plus damages they have suffered because of the breach of contract. The plaintiff further alleges that even if the jury were to find it to be a fact (which plaintiff denies) that plaintiff; [sic] damaged the machine, requested additional features be placed on the machine, or requested a machine that would handle previously unanticipated imperfections in the coils and washers, that the defendant has still had adequate time in which to perform; and that they are therefore entitled to most of their money back, as well as damages for breach of contract.

The remainder of this instruction set forth I.E.M.'s theory of the case and submitted the allegations of fact to the jury for its determination. Subsequent to the trial court's charge to the jury, Chromalox's counsel objected to the trial court's failure to give its requested instruction, stating:

> One of our causes of action is for breach of warranty. There's no instruction in here concerning breach of warranty for the jury to rule on. So we except to it, the lacking of this instruction. We submitted one to the court on breach of warranty.

The court allowed Chromalox's exception, but stated that it would go with the instructions as outlined because it believed that "comment on some specific items would—that are requested would actually constitute a comment on the evidence. The court believes these matters are open to argument."

It is the trial court's duty to cover both parties' theories and points of law in giving jury instructions, provided that there is competent evidence to support them. *Powers v. Gene's Bldg. Materials, Inc.*, 567

P.2d 174, 176 (Utah 1977); *Black v. McKnight*, 562 P.2d 621, 622 (Utah 1977); *Newsom v. Gold Cross Serv., Inc.*, 779 P.2d 692, 694 (Utah Ct.App.1989). However, the trial court may properly refuse to give instructions if they do not accurately reflect the law governing the factual situation of the case, *Black*, 562 P.2d at 622, or if they tend to mislead the jury to the prejudice of the complaining party or erroneously advise on the law. *See Mikkelsen v. Haslam*, 764 P.2d 1384, 1387 (Utah Ct. App.1988).

Upon review of the record and Chromalox's requested instruction, we agree with the trial court. The requested instruction set forth as fact two controverted issues: that defendants had actually and specifically agreed to the terms set forth in the instruction, which corresponded with the original purchase order rather than the alleged changes which evolved over the course of production of the machine; and that defendants had not successfully produced the machine. Because the instruction implied that these issues had already been decided, we find that the court appropriately exercised its discretion because the instruction could have misled the jury to respondents' prejudice. We, therefore, find Chromalox's argument to be without merit.

BENCH and ORME, JJ., concur.