CONSOLIDATION COAL COMPANY and Pittsburgh & Midway Coal Mining Company, Plaintiffs, Appellants, and Cross–Appellees,

v.

UTAH DIVISION OF STATE LANDS AND FORESTRY; Ralph Miles, Director of Division of State Lands and Forestry; Utah Board of State Lands and Forestry; Utah Department of Natural Resources; Dee Hansen, Executive Director of Utah Department of Natural Resources, Defendants, Appellees, and Cross–Appellants.

No. 920321.

Supreme Court of Utah.

Dec. 2, 1994.

Keith E. Taylor, Kenneth R. Barrett, Salt Lake City, for plaintiffs.

R. Paul Van Dam, Atty. Gen., David S. Christensen, Steven F. Alder, Asst. Attys. Gen., Salt Lake City, and Clark B. Allred, Gayle F. McKeachnie, Vernal, for defendants.

ZIMMERMAN, Chief Justice:

Consolidation Coal Company and Pittsburgh & Midway Coal Mining Company (collectively "Consol") appeal, and the Utah Division of State Lands and Forestry, the Utah Board of State Lands and Forestry, the Utah Department of Natural Resources, and various individual defendants employed by the State of Utah (collectively the "State") cross-appeal, a decision of the Seventh Judicial District Court of Emery County. This case involves the proper interpretation of the royalty provision in a coal lease entered into between the State and Consol and the amount of royalties and interest due under that provision. As discussed below, this case has previously been before this court and was remanded in *Plateau Mining Co. v. Utah Division of State Lands & Forestry*, 802 P.2d 720 (Utah 1990). On remand, the trial court held a two-day bench trial, after which it rejected Consol's arguments regarding the proper interpretation of the royalty provision and found that Consol had underpaid its royalties to the State by a substantial amount. The trial court further determined that Consol owed prejudgment interest on the unpaid royalties at an interest rate of 6%.

This time on appeal, Consol argues that the trial court erred (i) in rejecting the interpretation of the royalty provision purportedly established by the parties' course of conduct; (ii) in concluding that the interpretation of the royalty provision allegedly agreed to by the parties was a modification of the royalty provision; (iii) in failing to make necessary findings of fact; (iv) in finding that the State was not estopped from asserting a royalty higher than that which had been paid by Consol; and (v) in determining that prejudgment interest on the unpaid royalties was appropriate. Conversely, the State contends that the trial court erred in assessing a 6% interest rate on the unpaid royalties rather than the higher rates and penalties provided for under the Utah Board of State Lands and Forestry's rules and regulations. We reject all of Consol's claims of error but agree with the State that the trial court erred in assessing a 6% rate of interest. We remand for further proceedings on the interest rate matter.

Consol operates a coal mine in central Utah that includes State Coal Lease ML–25005 (the "Lease"). The land that is subject to the Lease was granted to the State for the support of the common schools by the United States Congress under the Utah Enabling Act. Utah Enabling Act ch. 138, §§ 6, 10, 28 Stat. 107 (1894). At all times relevant to this case, the school trust lands were managed by the Utah Division of State Lands and Forestry (the "Division") under policies, rules, and regulations established by the Utah Board of State Lands and Forestry (the "Board"). Utah Code Ann. §§ 65A–1–2, –1–4, –4–3, –7–1 (1993) (amended 1994).[1]

The State originally issued the Lease to Kemmerer Coal Company ("Kemmerer") in January 1968 for a twenty-year term. The State used a standard lease form in its transaction with Kemmerer. That form authorizes the lessee or its assignees to extract coal in exchange for specified royalties. These royalties are fixed at the higher of 15¢ per ton or the "rate prevailing, at the beginning of the quarter for which payment is being made, for federal lessees of land of similar character under coal leases issued by the United States at that time."[2] The Lease also indicates that it "is granted subject in all respects to and under the conditions of the laws of the State of Utah and existing rules and regulations and such operating rules and regulations as may be hereafter approved and adopted by the State Land Board."

1. In 1994, the legislature made extensive revisions to the Code sections dealing with school and institutional trust lands. *See* Utah Code Ann. §§ 53C–1–101 to –5–104. The revisions, among other things, create a new, independent agency within state government entitled School and Institutional Trust Lands Administration (the "Administration"). Utah Code Ann. § 53C–1–201. The Administration is vested with control over all trust lands in the state and is managed pursuant to policies established by the newly created School and Institutional Trust Lands Board of Trustees. *Id.*

2. In relevant part, the royalty provision reads:
   The Lessee, in consideration of the granting of the rights and privileges aforesaid, hereby covenants and agrees as follows:
   . . . .
   SECOND: To pay to Lessor quarterly, on or before the 15th day of the month succeeding each quarter, royalty

Kemmerer never mined the Lease and eventually assigned it to Consolidation Coal Company ("Consolidation") and its co-plaintiff in this case, Pittsburgh & Midway Coal Mining Company ("Pittsburgh & Midway"). On June 22, 1977, Consol submitted to the Utah State Division of Oil, Gas and Mining a proposed mine plan. The proposed mine, known as the Deep Emery Mine, consisted of private lands as well as state and federal leases, including federal lease number U5287.[3] The royalty rate payable on this federal lease was 17.5¢ per coal ton. Consol began mining during the second quarter of 1981 and continued to mine through 1986. During this time, it paid the State royalties of 17.5¢ per coal ton, on the basis of its view that the rate on its federal lease in the same mine constituted the "rate prevailing ... for federal lessees of land of similar character."

When the State issued the Lease in 1968, the federal government's royalty rate on its mining leases was generally 15¢ per ton.[4] In 1976, Congress enacted the Federal Coal Leasing Amendments Act ("FCLAA"). Pub.L. No. 94–377, 90 Stat. 1083 (1976). The FCLAA authorized the secretary of the interior to prescribe increased federal royalty rates on newly issued leases. 30 U.S.C. § 207 (1979). The new rates were fixed at 8% of the value of the coal produced from any underground mines. 43 C.F.R. § 3473.3–2(a)(3) (1979).

> (a) at the rate of 15¢ per ton of 2000 lbs. of coal produced from the leased premises and sold or otherwise disposed of, or
> (b) at the rate prevailing, at the beginning of the quarter for which payment is being made, for federal lessees of land of similar character under coal leases issued by the United States at that time, whichever is higher.

3. Consol indicates that no state leases were mentioned in the 1977 plan. The Lease involved in the present dispute was, however, within the Deep Emery Mine, regardless of whether it was mentioned in the 1977 plan.

4. Although the general federal cents-per-ton rate was 15¢, Consol's federal lease carried a rate of 17.5¢ per ton during the relevant time period. Consol argues that this 17.5¢-per-ton rate was the prevailing federal rate for lessees of land of similar character.

In December 1984, the State began an audit of state coal leases, including Consol's. The auditors discovered that in 1977, the royalty rates on newly issued federal coal leases had been increased to 8% but Consol and others had not reported or paid the higher rates on their state leases.

In October of 1985, the Division notified Consol that it owed the State the difference between 17.5¢ per ton and 8% of the value of all coal mined from the Lease up to that time and that all future royalties would be 8% of value. After receiving notice of the higher rate, Consol continued to mine the Emery Mine and pay only 17.5¢ per ton.

Consol filed this action, seeking a declaratory judgment that the royalty rate due under the Lease was 17.5¢ per ton of coal. It based its claim on the terms of the Lease and on its assertion that the State had agreed to the 17.5¢ royalty rate. The State counterclaimed, asserting that the rate was 8% of the value of the coal, which the State contended represented the prevailing federal rate. The State also denied entering into any agreement to fix the royalty rate at 17.5¢ per ton. Finally, the State claimed late-payment penalties and interest on the amount alleged to be owing.

The trial court initially granted summary judgment in favor of Consol on the ground that the rate provision was facially ambiguous. It ruled similarly in three other declaratory judgment actions brought by other mining companies against the State, all involving the 8% royalty. The State appealed the dismissals to this court, which consolidated the cases. We reversed the grants of summary judgment and remanded the cases with instructions to take further evidence on several issues, as discussed below. *Plateau Mining Co.*, 802 P.2d at 732.[5]

On the royalty question, we primarily addressed whether the trial court had erred in ruling that the alternative rate provision was ambiguous and therefore unenforceable. *Id.* at 725–28. We agreed with the trial court that the provision was somewhat ambiguous but disagreed that this made it unenforcea-

ble. *Id.* at 726. We concluded that any ambiguity in this case arose from the phrase "rate prevailing . . . for federal lessees of land of similar character." *Id.* In other words, the Lease provision was ambiguous only in the sense that the exact alternative rate was not clear on the face of the document, but this ambiguity did not make the Lease unenforceable. *Id.* Instead, we indicated that the fact finder should have resolved any ambiguity by reference to extrinsic evidence of the parties' intent. *Id.* We remanded the case to the trial court to determine how "the federal rate was to be calculated, what the rate was, and when it became 'prevailing,' if it did." *Id.*

Because the matter had been decided on summary judgment, the trial court had not determined whether Consol had reached an "agreement" with the State regarding the proper interpretation of the royalty provision. *Id.* at 727. This agreement allegedly set the royalty rate on Consol's Lease at 17.5¢ per ton, which corresponded with the rate Consol was paying on its federal lease in the same mine. *Id.* We remanded the case to the trial court to decide this issue on the merits. *Id.*

In short, two broad questions relating to the proper interpretation of the alternative rate provision were to be decided on remand. First, what was the prevailing rate, and when did it become prevailing? Second, did Consol and the State "agree" upon an interpretation of the royalty provision, or is the State estopped from denying such an agreement, under which 17.5¢ would be the prevailing rate for federal lessees of land of similar character? As to the issue of interest on the unpaid royalties, the trial court was to determine whether prejudgment interest was appropriate and the rate at which it was to be computed. *Id.* at 732.

On remand, the trial court conducted a two-day bench trial. It found that (i) during the relevant period, "the same federal royalty rate was being charged by the federal government during the audit period for coal

---

**5.** The present case involves only Consolidation and Pittsburgh & Midway. The other coal companies are no longer involved in this suit.

leases in Utah on all land whether it was within the same mine, the same canyon, or the same area"; (ii) the "rate prevailing for federal lessees of land of similar character" was 8% of value; (iii) the Division had no authority to modify the Lease, and in any case, the parties had not agreed to set the rate at 17.5¢ per ton; (iv) Consol had failed to prove that the State's actions estopped it from asserting a royalty rate higher than 17.5¢ per ton; and (v) the State was entitled to interest at a rate of 6% on the unpaid royalties.[6] Consol again appeals the judgment as a whole, and the State cross-appeals as to the interest rate issue.

■ We first state the proper standard of review. We previously remanded the case to the trial court to hear evidence on the prevailing-rate and "agreement" questions. Despite Consol's arguments to the contrary, the primary issue in this appeal is whether the trial court erred in resolving these factual questions. We review the trial court's findings of fact under the clearly erroneous standard. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R.Civ.P. 52(a). The party challenging the trial court's factual findings has the heavy burden of establishing that those findings are not supported by substantial and competent evidence. *Cambelt Int'l Corp. v. Dalton*, 745 P.2d 1239, 1242 (Utah 1987). To meet this burden, "an appellant must first marshal all the evidence supporting the finding and then demonstrate that the evidence is legally insufficient to support the findings even in viewing it in the light most favorable to the court below." *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899 (Utah 1989); *see also Cornish Town v. Koller*, 758 P.2d 919, 922 (Utah 1988); *Cambelt Int'l*, 745 P.2d at 1242.

■ We next address Consol's claims relating to the royalty rate fixed by the alternative rate provision of the Lease. Consol contends that the trial court erred in rejecting the interpretation of this provision alleg-

edly agreed to by the parties and in determining that Division personnel did not have the authority to agree to a modification of the Lease. Consol argues that the trial court misunderstood its position. It denies arguing that the parties entered into an agreement to modify the Lease and admits that there was no such agreement. Rather, it claims that the parties reached an agreement as to the proper interpretation of the alternative rate provision. It claims that the "Division had the implied authority to make a reasonable interpretation of" Board statements regarding the meaning of the provision. According to Consol, the Division agreed that the alternative rate provision required Consol to pay the same rate it was paying on a federal lease in the same mine— 17.5¢ per ton. Consol asserts on appeal that the trial court failed to address this interpretive-agreement argument and neglected to make findings of fact regarding it.

Consol correctly asserts that the trial court did not enter a finding specifically negating the existence of an interpretive agreement. Nevertheless, we disagree that the trial court failed to consider and improperly rejected Consol's interpretive-agreement argument. Our decision is based upon three factors: (i) the fair import of the trial court's opinion is that it understood but rejected Consol's interpretive-agreement argument; (ii) the trial court did specifically negate Consol's evidence in support of the argument; and (iii) Consol's interpretation appears facially incompatible with the language of the alternative rate provision.

First, the fair import of the trial court's opinion, when read in context and as a whole, is that it understood Consol's interpretive-agreement argument but declined to accept it. At trial, Consol argued in support of the alleged agreement, while the State argued against the existence of an agreement and argued instead that the prevailing rate was 8%. The court had to choose between these mutually exclusive versions of the facts. The court was not required to negate each specific element of Consol's version of the facts.

---

**6.** This is intended only as a brief synopsis of the trial court's decision. The court entered a lengthy memorandum opinion and separate findings of fact and conclusions of law.

*See Sorenson v. Beers,* 614 P.2d 159, 160 (Utah 1980). It simply found that the facts supported the State's position and that the parties did not agree to set the rate at 17.5¢ per ton, regardless of whether the alleged agreement is characterized as an agreement to modify or an agreement to interpret the contract.

Second, the trial court made specific findings of fact regarding the evidence that Consol presented in support of the alleged interpretive agreement. These findings are consistent with the State's position, namely, that the trial court understood Consol's argument but did not accept it. Consol relies heavily on minutes from Board meetings held in 1973 and 1975 as well as on discussions with Division officials which occurred prior to the opening of the mine. The trial court expressly declined to adopt Consol's interpretation of Board minutes. It found that a "clear reading of those minutes ... shows that there was no discussion or conclusion reached by the Board as to the specific meaning of" any of the royalty terms in the Lease.[7] We find no evidence suggesting that the court clearly erred in making this determination.

The trial court also addressed Consol's evidence relating to the discussions between Division officials and Consol. Consol is correct in stating that the trial court did not negate the fact that those discussions occurred. Consol incorrectly asserts, however, that the trial court failed to make findings of fact regarding them and therefore must have failed to consider them. In fact, the trial court did address the discussions. It found that during the discussions, Consol had failed to disclose relevant information to Division employees with whom it dealt. Specifically, the trial court expressly found that Consol

had neglected to inform Division employees of the FCLAA and its change in federal rates. In addition, the trial court did not find that Consol had disclosed the fact that it had several federal leases in Utah and had unsuccessfully appealed the government's readjustment of those leases to an 8% royalty or the fact that Consol had been issued a new federal lease in 1983 that carried an 8% royalty. Under the Lease, Consol had the responsibility of calculating the royalty and submitting the required royalty information. In *Plateau Mining Co.,* we noted: "The plaintiffs were responsible for calculating the alternative federal prevailing royalty payments.... The State had a right to rely on the good faith of its lessees in calculating the royalty and submitting the required information." 802 P.2d at 727. The FCLAA and its change in federal rates should have raised a serious question as to the proper royalty rate, and thus, Consol should have disclosed the FCLAA to the State's agents.

In sum, the trial court did not fail to consider the discussions, nor did it consider them relevant only to an agreement to modify the contract. Rather, we conclude from the trial court's findings and conclusions that it declined to find any binding agreement, because doing so would permit Consol to take advantage of its failure to disclose to the State facts that would have raised serious questions as to Consol's position. *See* 3 *Corbin on Contracts* § 558 (1960). We find no error here.

Finally, Consol's interpretation, which it claims the State agreed to, is particularly difficult to accept, given its significant divergence from the language of the provision. The provision required payment of the "rate prevailing, *at the beginning of the quarter for which payment is being made,* for *federal*

---

7. Moreover, we do not see how minutes from Board meetings held in 1973 and 1975 would be particularly persuasive, even if those minutes read exactly as Consol claims they do. Congress did not pass the FCLAA until 1976. The FCLAA and implementing regulations changed the federal rates and redefined the classification of federal leases. After the passage of the FCLAA, the primary, and arguably only, "characteristic" relevant for purposes of federal royalty rates is whether the mine is surface or underground. *See* 30 U.S.C. § 207(a); 43 C.F.R. § 3473.3–

2(a)(3). The federal government had only one minimum rate for readjusted or newly issued leases in underground mines—8%. The trial court found that this rate was the same regardless of whether the leases were in the same area, canyon, or mine. As a result, Board minutes from the pre-FCLAA era that purport to define what constitutes "land of similar character" are not particularly useful in the present regulatory milieu, in which there are generally only two federal rates and the dispositive "characteristic" is the nature of the mine.

*lessees* of land of similar character." Consol's interpretation, which the Division allegedly agreed to, subtly alters this critical phrase in two ways. First, Consol's interpretation requires it to look only at the rate it paid for *its lease* in the same mine. Instead of focusing on the rates paid by all federal *lessees*, Consol primarily highlights the one and only lease it held in that mine, which had a rate of 17.5¢ per ton.

Consol's interpretation also "reads out" the portion of the alternative rate provision that requires Consol to determine and submit the prevailing rate on a quarterly basis. Consol relies on an agreement allegedly arising from discussions between the State and Consol during 1978 and 1981 and Board meetings held before 1976. This purported agreement binds the State to the 17.5¢ royalty rate until readjustment.[8] Under Consol's interpretation, as long as it held a federal lease at 17.5¢ per ton, its state leases would bear the same rate, regardless of subsequent changes in the federal rate structure, the rates paid by other lessees, or the number of other federal lessees holding leases with that rate. The Lease, however, provided for a fluctuating rate to be redetermined quarterly. The obvious purpose of this provision is to prevent the royalty lock-in that Consol now asserts.

In conclusion, the trial court was vested with the responsibility of resolving factual conflicts. The amount of the prevailing federal rate and the existence *vel non* of an agreement to interpret the Lease are factual questions solidly within the discretion of the trial court. The trial court accepted the State's version of the case and rejected Consol's. We cannot conclude that the evidence on these issues "so clearly preponderates in favor of the appellant that reasonable people would not differ on the outcome." *E.A. Strout W. Realty Agency, Inc. v. W.C. Foy & Sons, Inc.*, 665 P.2d 1320, 1322 (Utah 1983). We affirm the trial court's determination as to the prevailing federal royalty rate.

■ Consol next contends that the trial court failed to make necessary findings of fact. Nevertheless, other than attacking the trial court's decision not to adopt its interpretation of the Lease, Consol does not specify the missing findings. We reiterate that "[a] trial court need not resolve every conflicting evidentiary issue, '[n]or is the court required to negate allegations in its findings of fact.' " *Sampson v. Richins*, 770 P.2d 998, 1003 (Utah Ct.App.1989) (quoting *Sorenson*, 614 P.2d at 160). Rather, "[t]he [trial court's factual] findings must be articulated with sufficient detail so that the basis of the ultimate conclusion can be understood." *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899 (Utah 1989). We have examined the trial court's memorandum decision and findings of fact and find them to be well-reasoned and fully supported by the record. It was not necessary for the trial court to negate Consol's version of the case point by point. The trial court needed to make only those findings necessary to its decision, which it has done.

■ Consol alleges that the trial court erred in finding that the State was not estopped from asserting an 8% royalty rate. This is not the first time we have addressed the estoppel issue in this case. In *Plateau Mining Co.*, the plaintiffs argued that the State's acceptance of lower royalty rates had estopped it from later collecting a higher royalty rate. 802 P.2d at 730. We rejected this basis for estoppel but remanded the case to give the plaintiffs an opportunity to present other evidence that might support a finding of estoppel. *Id.* As noted before, on remand the trial court held a two-day bench trial and ultimately found that Consol had not met its burden of proving that the State was estopped.

Consol makes four arguments on appeal in support of its estoppel claim. It contends that (i) the State made representations inconsistent with its later position; (ii) Consol acted with reasonable prudence and due diligence; (iii) it would suffer injustice if the

---

8. Much of the trial court's discussion regarding modifications to the Lease is in the context of the provision's quarterly reassessment requirement. The trial court correctly notes that Consol's interpretation is inconsistent with the requirement that Consol determine and submit the royalties on a quarterly basis. The trial court goes on to determine that Consol's interpretation, even if the parties had agreed to it, would have required a modification of the Lease.

State is not estopped; and (iv) estoppel in this case would have no substantial adverse effect on public policy.

Consol attempts to portray each of these estoppel arguments as raising both legal and factual issues. Upon examination, however, it appears that Consol is primarily arguing that the trial court erred in finding that Consol did not meet its burden of proving estoppel against the State. Consol's only potential legal question relating to estoppel is the public policy argument. Nevertheless, we do not reach this argument because we dispose of the estoppel issue on other grounds.

We review a trial court's findings of fact under the clearly erroneous standard. Utah R.Civ.P. 52(a). Consol, as the party challenging those findings, has the heavy burden of marshaling all the evidence in support of the trial court's findings and then showing that those findings are not based on competent, admissible evidence. *Cambelt Int'l Corp. v. Dalton,* 745 P.2d 1239, 1242 (Utah 1987). Consol has not met its burden of marshaling the facts or of showing that the trial court clearly erred in deciding that the State was not estopped.

■ We briefly review the applicable law. The equitable doctrine of estoppel has three factual predicates: " '(1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.' " *Plateau Mining Co.,* 802 P.2d at 728 (quoting *Celebrity Club, Inc. v. Utah Liquor Control Comm'n,* 602 P.2d 689, 694 (Utah 1979)).

■ These requirements are expanded when a party is attempting to estop the State or its agents. "The State may not be estopped unless injustice would result [if the

State is not estopped] and there would be no substantial adverse effect on public policy." *Id.; see also Utah State Univ. v. Sutro & Co.,* 646 P.2d 715, 718 (Utah 1982). *See generally United States v. Kirkpatrick,* 22 U.S. (9 Wheat.) 720, 735–37, 6 L.Ed. 199 (1824) (discussing reasons for denying equitable defenses in actions by the government). Moreover, as a prerequisite to a finding of injustice, the party asserting estoppel must show that it acted with "reasonable prudence and diligence" in relying on the State's representations. *Morgan v. Board of State Lands,* 549 P.2d 695, 697 (Utah 1976).[9]

Because we find the issue dispositive, we first address Consol's assertion that it acted with reasonable prudence and due diligence. It argues that it acted reasonably in determining the appropriate rate and in relying on the State's alleged representations. It contends that the alternative rate provision was ambiguous and therefore it sought clarification regarding the proper rate from Division personnel. As discussed above, Division personnel told Consol that under the alternative rate provision, it should pay the same rate it was paying the federal government under its federal lease *at the same mine.*[10] Consol had a federal lease at the same mine which at all relevant times carried a 17.5¢ royalty. It argues that the State represented to it that this 17.5¢ royalty rate for the federal lease in the same mine represented the "prevailing" rate being paid by "federal lessees of land of similar character under coal leases issued by the United States at that time," as required by the Lease.

Consol further argues that although it was aware of the FCLAA and the general 8% royalty, a reasonable mine operator, looking at all the federal leases in Utah, would not necessarily have concluded that 8% was the prevailing rate. Therefore, the argument continues, Consol acted reasonably in relying on the Division's alleged representations.

---

**9.** As we stated in *Morgan v. Board of State Lands,* 549 P.2d 695, 697 (Utah 1976):

Estoppel arises when a party ... by his acts, representations, or admissions, or by his silence when he ought to speak ... induces another ... to believe certain facts to exist and that such other ... acting with reasonable

prudence and diligence, relies and acts thereon so that he will suffer an injustice if the former ... is permitted to deny the existence of such facts.

**10.** Consol relies on the same evidence it used to support its reasonable-interpretation argument.

We recognize that there is some evidence supporting Consol's claim that it acted reasonably and prudently. Nevertheless, the trial court found otherwise, and after examining the record, we do not find that judgment to be clearly in error.[11]

In particular, the trial court found that Consol's "only action to determine the correct royalty rate was to talk to employees of the Division as to their understanding of the meaning of the royalty provision ·without making any other inquiries." Consol never sought a written decision from the Board regarding the proper royalty rate.

More important, the trial court found that Consol had failed to inform Division employees and the Board regarding the FCLAA and the 8% royalty. As noted earlier, if there was any doubt as to the appropriate royalty rate, Consol should have disclosed the existence of the FCLAA to the Board and the Division and then sought written clarification. Consol, after withholding information, is not entitled to claim protection under the estoppel doctrine. *See Morgan,* 549 P.2d at 697 n. 4 ("The doctrine of equitable estoppel does not operate in favor of one who has knowledge of the essential facts or who has convenient and available means of obtaining such knowledge.").

Consol's claims of reasonable prudence and due diligence are particularly tenuous given that Consol continued to mine coal and to pay only 17.5¢ per ton *even after receiving notice* from the State of the results of the audit and the 8% royalty rate. In fact, Consol mined an additional 251,245 tons of coal from the Lease, which equalled over half of the total amount mined from the Lease. They cannot successfully claim continued

reasonable reliance on representations which, even if once made, the State subsequently disavowed.

In sum, "[e]stoppel is a doctrine of equity purposed to rescue from loss a party who has, without fault, been deluded into a course of action by the wrong or neglect of another." *Id.* at 697. Consol is not without fault. Any delusion in this case resulted, at least in part, from its inadequate steps to determine the correct royalty rate and its concurrent failure to disclose all relevant information to the State's agents. Consol had a legal duty to prepare and forward a certified statement indicating the amount of coal produced and the proper royalty rate.[12] We find competent and admissible evidence in the record to support the trial court's determination that Consol did not act with reasonable prudence and due diligence in fulfilling this duty. Because Consol has failed to meet its burden of proving that it acted with reasonable prudence, which is a necessary prerequisite to estoppel, we need not address the remainder of its estoppel arguments.

■ Consol next contends that the trial court erred in awarding prejudgment interest. According to Consol, the uncertainty inherent in determining the prevailing federal royalty rate precludes the imposition of prejudgment interest in this case. It relies primarily on *Bjork v. April Industries, Inc.,* 560 P.2d 315 (Utah), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977), in which this court restated the general rule as to prejudgment interest:

> As to the allowance of interest before judgment, this Court has heretofore spoken, and the law in Utah is clear, viz: where the damage is complete and the amount of

11. The trial court's findings relevant to the estoppel issue can be summarized as follows: (i) The prevailing rate paid by "federal lessees of land of similar character under coal leases issued by the United States at that time" was 8%; (ii) Consol knew or should have known that this was the prevailing rate; (iii) Consol did not act with reasonable prudence and due diligence in ascertaining the correct rate; (iv) Consol failed to inform the State that it was familiar with the FCLAA and the 8% royalty rates thereunder; (v) Consol did not reasonably rely on any representation by the State; (vi) Consol never requested a decision from the Board regarding the royalty

rate; and (vii) there is no injustice in requiring Consol to pay the 8% royalty.

12. In *Plateau Mining Co. v. Utah Division of State Lands & Forestry,* 802 P.2d 720, 729 (Utah 1990), we concluded that "it cannot be said on this record that the plaintiffs were without fault, or even that they acted with reasonable prudence and diligence in ascertaining the correct rate to be paid." Upon examination of the record now before us, it appears that our appraisal of Consol's conduct in *Plateau Mining Co.* still applies with equal force in this case.

the loss is fixed as of a particular time, and that loss can be measured by facts and figures, interest should be allowed from that time and not from the date of the judgment. On the other hand, where damages are incomplete or cannot be calculated with mathematical accuracy, such as in case of personal injury, wrongful death, defamation of character, false imprisonment, etc., the amount of damages must be ascertained and assessed by the trier of the fact at the trial, and in such cases prejudgment interest is not allowed.

*Id.* at 317 (footnote omitted); *see also Jorgensen v. John Clay & Co.*, 660 P.2d 229, 233 (Utah 1983). Consol asserts that this case is analogous to defamation, false imprisonment, and similar cases in which a trier of fact, to some extent, must subjectively estimate when the damages are complete and the amount of those damages. We disagree.

The Lease required Consol to pay the prevailing rate paid by federal lessees of land of similar character. The trial court found that 8% was the prevailing federal rate at all relevant times. Consol has not alleged that

it is or was unable to determine the value of the coal mined. Consequently, the amount of unpaid royalties can easily and accurately be determined by multiplying the value of the coal mined during each royalty period by 8% and then deducting the royalty amounts which were timely paid for that period. The damages were complete and ascertainable as of the date each royalty payment became due and owing. Therefore, Consol owes interest on the unpaid portion of the royalty payments from the date each payment became due.

■ Having determined that an award of prejudgment interest is proper, the next issue becomes the appropriate rate of interest. The trial court awarded prejudgment interest at the 6% rate that was provided for in section 15-1-1 at the time the Lease was signed, which would amount to $460,725.38 in interest.[13] The State argues in its cross-appeal that the trial court should have awarded interest and assessed late-payment penalties at the rates provided for in the Board's rules and regulations.[14] If the trial

---

13. Section 15-1-1 reads:

> (1) The parties to a lawful contract may agree upon any rate of interest for the loan or forbearance of any money, goods, or chose in action that is the subject of their contract.
>
> (2) Unless the parties to a lawful contract specify a different rate of interest, the legal rate of interest *for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum.*
>
> (3) Nothing in this section may be construed in any way to affect any penalty or interest charge that by law applies to delinquent or other taxes or to any contract or obligations made before May 14, 1981.

Utah Code Ann. § 15-1-1 (emphasis added). On the basis of our decision in *SCM Land Co. v. Watkins & Faber*, 732 P.2d 105 (Utah 1986), Consol argues that the prejudgment interest rate in this case is locked into the section 15-1-1 rate that was in effect at the time the Lease was signed, which is 6%.

The author of this opinion has serious reservations about the initial correctness and therefore the continued vitality of *SCM Land* and any other case that purports to tie prejudgment interest rates in all contract cases to the section 15-1-1 rate in effect at the time the contract was signed. *See, e.g., Breuer–Harrison, Inc. v. Combe,* 799 P.2d 716, 731–32 (Utah Ct.App.1990). The plain language of section 15-1-1 seems to indicate that the section was intended to apply only to a "loan or forbearance" of "money, goods or chose in action." Utah Code Ann. § 15-1-1. In other

words, it provides a default interest rate when the parties have failed to specify an interest rate for "the loan or forbearance of any money, goods, or chose in action that is the subject of their contract." *Id.* The subject of the present contract is the sale of mineral rights, not a loan or forbearance. This was also the case in *SCM Land.* That opinion adopted its view of section 15-1-1's applicability without discussing the limiting language of that section. Nevertheless, because the State has failed to raise this issue and its resolution is not necessary for a disposition of this case, we decline to address it.

14. In his concurring and dissenting opinion, Judge Bench asserts that this issue is governed by the court of appeals' decision in *Trail Mountain Coal Co. v. Utah Division of State Lands. & Forestry,* 884 P.2d 1265 (Ct.App.1994), a companion to the present case that we poured to the court of appeals for decision. Judge Bench maintains that *Trail Mountain* is now part of our common law and that while we do have the power to overrule that decision, our authority to do so is limited by *State v. Menzies,* 23 Utah Adv.Rep. 23, 1994 WL 110861 (Mar. 29, 1994). In *Menzies,* we explained that under the doctrine of stare decisis, we will follow our *"own precedents ...* unless [we are] clearly convinced that the [precedent] was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent." *Id.* at 25. (emphasis add-

court had applied the Board's rules and regulations regarding interest and penalties, Consol would have owed $1,473,856.09 in interest and penalties.[15]

As noted above, the State argues that because the Lease involved school trust lands, the Board was authorized by statute and compelled by the state and federal constitutions to promulgate its own interest rates and late-payment penalties.[16] The State further argues that if Consol had paid the proper royalties when due, the funds would have been deposited in one of the school trust accounts and would have earned the same interest rates as did the other trust funds. These trust funds earned significantly more than the statutory rate for the period in question. The statutory rate of 6%, therefore, fails to return "full value" on the funds derived from the Lease. In response, Consol contends that Utah law did not authorize or require the Board to set rates or penalties and the Lease did not empower the Board to set late-payment interest rates and penalties. We agree with the State.

To provide the necessary background, we review briefly the law governing school trust lands. When Utah attained statehood, Congress granted lands to the State for the support of the common schools. Utah Enabling Act ch. 138, §§ 6, 10, 28 Stat. 107 (1894). The State accepted the conditions and obligations of this grant of federal lands by its adoption of article X, section 3 of the Utah Constitution. Utah Const. art. X, § 3 (1896) (current version at Utah Const. art. X, § 5 (1986)). The State thus holds legal title, as trustee, to the school trust lands and the funds generated by those lands. *Duchesne County v. State Tax Comm'n*, 104 Utah 365, 140 P.2d 335, 336 (1943).

The State has an irrevocable duty to manage these trust lands for the sole benefit of the common schools and to receive "full value" from any disposition of its school trust lands. *Lassen v. Arizona ex rel. Arizona Highway Dep't*, 385 U.S. 458, 466, 87 S.Ct. 584, 588, 17 L.Ed.2d 515 (1967);[17] *Plateau Mining Co.*, 802 P.2d at 729; *see also Kadish v. Arizona State Land Dep't*, 155 Ariz. 484, 497, 747 P.2d 1183, 1196 (1987) (holding unconstitutional a statute fixing flat royalty rate for mineral leases on school trust lands), *aff'd*, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989); *cf. Oklahoma Educ. Assoc. v. Nigh*, 642 P.2d 230, 236–37 (Okla.1982) (holding unconstitutional a statute establishing maximum rent chargeable for school trust lands). The State may not alter or abrogate this duty, nor may it make any disposition of the property which conflicts with this duty. *Trustees of Vincennes Univ. v. Indiana*, 55 U.S. (14 How.) 268, 14 L.Ed. 416 (1852). In accordance with the mandate to obtain full value, the State, through its

ed) (quoting John Hanna, *The Role of Precedent in Judicial Decision*, 2 Vill.L.Rev. 367, 367 (1957)). Under Judge Bench's expansive reading of *Menzies*, however, this court would be bound to follow not only our own precedents, but also those of the court of appeals. In response, we note simply that Judge Bench misreads *Menzies* and that his understanding of stare decisis is without any support in case law or in academic literature. This court is never bound by decisions of the court of appeals and does not need to overcome any particular hurdles in overruling them.

**15.** We review briefly the history of the Board's late payment penalties. Effective November 4, 1982, an interest rate of 1.5% per month was charged to past due royalties. Effective December 31, 1983, an interest rate of 1.5% per month was charged on past due royalties, together with a 6% late fee penalty. Effective July 1, 1986, the Board charged an adjustable interest rate based on the rate charged by the Internal Revenue Service plus 4% on all past due royalties. From July 1986 to the present, the rates charged by the State on delinquent royalties were at times as high as 15%.

**16.** Although an argument might be made for analyzing the interest rate issue and the penalty issue differently, neither Consol nor the State has elected to do. We therefore decline to do so.

**17.** In *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976), the United States Supreme Court held that a state could not lease its school trust lands for less than full value. According to the Court:

[T]he trust is to receive, at the time of its disposition of any interest in the land, the then full value of the particular interest which is being dispensed.... Thus, if the lease of trust lands calls for a rental of substantially less *than the land's then fair rental value, it is null and void....*

*Id.* at 303, 96 S.Ct. at 916.

agencies and officers, must manage the trust lands in the most "prudent and profitable manner possible." *Colman v. Utah State Land Bd.*, 17 Utah 2d 14, 403 P.2d 781, 783 (1965).[18] To fulfill its duties and responsibilities, the legislature established the Board of State Lands and gave it the power and authority to set policy for all state lands, including school trust lands. *See* Utah Code Ann. §§ 65-1-1, -14 (1987) (repealed 1988).[19]

The Board's authority *vel non* to set interest rates and penalties on late royalty payments is a question of law, which we review for correctness. *See Bennion v. ANR Prod. Co.*, 819 P.2d 343, 346 (Utah 1991); *Ward v. Richfield City*, 798 P.2d 757, 759 (Utah 1990).

As noted above, Consol argues that the Board lacked the authority to promulgate interest rates and penalties for leases and instead asserts that this case is governed by section 15-1-1. We agree with Consol insofar as it contends that under our decision in *SCM Land Co. v. Watkins & Faber*, 732 P.2d 105 (Utah 1986), section 15-1-1 would apply if the Board lacked authority to set interest rates and penalties. We conclude, however, that the Board had such authority.

At all times relevant to this case, the Board had broad discretionary authority over the governance of all state lands, including school trust lands.[20] In particular, the legislature vested the Board with the power to "make and enforce rules and regulations not inconsistent with the provisions of this act for carrying the same into effect." Utah Code Ann. § 65-1-97 (1987) (repealed 1988). Further, the Code contained provisions specifically authorizing the Board to make rules and regulations governing mineral leases with the State:

> Except as otherwise provided by law, the State Land Board shall by rules and regulations prescribe the form of application, the form of the lease, the annual rental, the amount of the royalty and the basis upon which the royalty shall be computed, *and such other details as it may deem necessary in the interest of the State.*

Utah Code Ann. § 65-1-23 (1987) (emphasis added) (repealed 1988). Our case law is clear that the legislature intended to give the Board particularly wide discretion in the area of state lands. As we noted in *McKnight v. State Land Board*, 14 Utah 2d 238, 381 P.2d 726, 731 (Utah 1963):

> The Land Board has full power and authority to prescribe necessary and proper rules and regulations to accomplish its purposes and objectives as set out by statute. . . . The provisions of the [act governing state lands] clearly indicate that the Legislature had in mind the distinction between a positive mandate to the Board and a permissive right to take certain actions in its discretion.

Moreover, as the government entity charged with executing the State's responsibilities as trustee of school trust lands, the Board had "such implied powers as [were] reasonably necessary" to effectuate its constitutional mandate to obtain full value and to prudently and profitably manage school trust lands. *See Bennion*, 819 P.2d at 350; *Williams v. Public Serv. Comm'n*, 754 P.2d 41, 50 (Utah 1988).

The Board utilized its discretionary authority to promulgate rules and regulations

---

18. Given the trust's purposes, the courts have scrupulously guarded against attempts to dispose of trust assets for less than full value. *See, e.g., Kadish v. Arizona State Land Dep't*, 155 Ariz. 484, 747 P.2d 1183 (1987), *aff'd*, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989); *County of Skamania v. Washington*, 102 Wash.2d 127, 685 P.2d 576 (1984); *see also Department of State Lands v. Pettibone*, 216 Mont. 361, 702 P.2d 948 (1985).

19. As noted earlier, the responsibility and authority to manage trust lands is now vested in another government agency. *See supra* note 1 (discussing changes to Utah trust land management system).

20. Although the Board was authorized by statute to set policy for all state lands, including school trust lands, prior to 1988 the Code did not contain specific discussions as to the Board's duties regarding school trust lands. *See* Utah Code Ann. §§ 65-1-1 to -116 (repealed 1988). In 1988, the legislature clarified that the Board had expansive statutory authority and power to "adopt rules" and policies consistent with the proper administration of state school trust lands. Utah Code Ann. § 65A-1-2 (1993) (amended 1994).

that provided for late-payment interest and penalties. We find the Board's rules and regulations reasonably necessary, well within its statutory authority, and consistent with its duty to manage school trust lands. These rules serve at least two significant purposes. First, consistent with the State's constitutional duty to prudently and profitably manage trust lands, they assist in ensuring the proper and timely payment of royalties on mineral leases.[21] Second, and perhaps more important, they guarantee that the State receives full value for the trust lands by setting interest rates that reflect the true value of the royalties which Consol withheld in violation of its Lease.

In short, we conclude that the specific constitutional requirement that the State obtain full value for its school trust lands, in conjunction with the legislature's broad grant of authority to the Board and our case law indicating that the Board has such further implied powers as are reasonably necessary to carry out its constitutional duties, mandates the conclusion that the Board is empowered to set interest rates and penalties regarding school trust lands. Assuming that the interest rates and penalties were adopted in accordance with laws governing the promulgation of administrative rules and regulations—and Consol has not argued otherwise—the imposition of interest and penalties was a proper exercise of the Board's authority over school trust lands.[22]

■ Finally, Consol's argument below, which was adopted by the trial court, that

**21.** Outside the context of school trust lands, we have upheld as constitutional the statutory authority of regulatory agencies to impose civil penalties. *Chris & Dick's Lumber & Hardware v. Tax Comm'n*, 791 P.2d 511, 513–16 (Utah 1990) (upholding commission's imposition of 10% late-payment penalty pursuant to statutory authority plus interest on late tax payments); *Thomas J. Peck & Sons, Inc. v. Public Service Comm'n*, 700 P.2d 1119, 1123 (Utah 1985) (holding that public service commission's statutory authority to impose civil penalty for failure to adhere to Motor Carrier Act is constitutional); *Wycoff Co. v. Public Service Comm'n*, 13 Utah 2d 123, 369 P.2d 283, 285 (1962) (indicating that it is "well established" that the public service commission has the legitimate statutory authority to impose monetary penalties for violation of its lawful orders and regulations).

**22.** Judge Bench's opinion, if adopted, would deprive the beneficiaries of the school trust lands of the difference between 6% and the interest rate the trust would have earned if Consol had not violated the terms of the Lease. In other words, Judge Bench would reward Consol, at the expense of the school trust beneficiaries, by allowing it to retain a portion of the royalties in violation of the Lease and then repaying them royalties at a below-market rate of interest that is significantly less than the State would have made on the royalties had Consol simply paid them on time. Judge Bench would, in effect, sanction a de facto below-market-rate loan of funds from the school trust lands to Consol. We have serious questions about the constitutionality of such a result. *Cf. Kadish*, 747 P.2d 1183; *see also Oklahoma Educ. Assoc. v. Nigh*, 642 P.2d 230 (1982). Similarly, Consol's analysis disallowing the Board's rules and regulations governing interest rates and applying section 15–1–1 would result in a de facto loan from school trust lands at below-market rates of interest.

Given that the Utah Enabling Act and state and federal constitutions "unequivocally demand" that the trust fund be paid the full value of any minerals transferred from it, we have serious doubts that the application of 15–1–1 in this case would withstand constitutional scrutiny. *See Lassen v. Arizona ex rel. Arizona Highway Dep't*, 385 U.S. 458, 466, 87 S.Ct. 584, 588, 17 L.Ed.2d 515 (1967); *see also Kadish*, 747 P.2d 1183. Nevertheless, "[i]t is a fundamental rule that we should avoid addressing a constitutional issue unless required to do so. As a corollary of that principle, we construe statutes, if possible, to avoid the risk of running afoul of constitutional prohibitions." *State v. Wood*, 648 P.2d 71, 82 (Utah 1982) (citations omitted), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *State v. Bell*, 785 P.2d 390, 397 (Utah 1989). We therefore decline to construe section 15–1–1 as broadly, or the Board's authority as narrowly, as Consol would have us do. We instead choose to harmonize the interest rate provision with the provisions governing school trust lands by holding that the Board has the power to set rules and regulations consistent with its duty to manage school trust lands. As we recognized in *McKnight v. State Land Board*, 14 Utah 2d 238, 381 P.2d 726 (1963):

> "Rules made in the exercise of a power delegated by statute should be construed together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason.... If it can be fairly done, [an administrative] rule should be construed and applied as to make it conform to the powers conferred upon the administrative body, rather than as being an assumption of power not conferred."

*Id.* 381 P.2d at 731 (quoting 42 Am.Jur.*Public Admin.Law* § 101).

the regulations changed the terms of the Lease, fails to recognize that the Lease is expressly subject to the laws of Utah.[23] The Lease provides that it was "granted subject ... [to] the conditions of the laws of the State of Utah." *Cf. Rosebud Coal Sales Co. v. Andrus,* 667 F.2d 949, 951 (10th Cir.1982) (indicating that federal coal leases must be considered in context of federal Mineral Leasing Act). The laws of Utah include not only the statutes which authorize the Board to govern school trust lands, but also the constitutional requirement that the State manage its lands in the most prudent and profitable manner possible and receive full value for its school trust lands. In other words, the Lease is expressly subject to the trust and the State's regulatory power to enforce the terms of the trust.[24] *Cf. id.*

Further, even if the Lease did not contain an express provision subjecting it to the terms of the trust, Consol took the Lease with notice of, and subject to, the law governing school trust lands and the trust responsibilities of the State. *See ASARCO v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). In short, the State has reserved the power to enforce the terms of the Lease and to make other rules and regulations in furtherance of its constitutional duty to manage school trust lands.

On the basis of the above, we hold that the Board's rules and regulations prescribing interest rates and penalties on late payments were a proper exercise of its broad statutory authority to manage the trust lands and to guarantee that the school trust fund receives full value for the trust property. We remand this case to the trial court to determine, consistent with this opinion and the Board's rules and regulations, the proper interest charges and late-payment penalties.

We have considered the rest of Consol's arguments and find them to be without merit. We affirm in part, reverse as to the proper interest rate and penalties, and remand for further proceedings as indicated above.

HOWE and DURHAM, JJ., concur.

BENCH, Judge, concurring and dissenting:

I concur in the majority's determination that the State is entitled to additional royalties from Consol. I dissent, however, from the majority's conclusion that section 15–1–1 does not apply in this case and in its decision to allow the Board unilaterally to modify the interest rate on amounts owed under its existing contracts.

### Statutory Prejudgment Interest

The trial court was clearly correct in awarding prejudgment interest pursuant to section 15–1–1. This statute has consistently been interpreted to specify the prejudgment interest rate where it is not specified in the

**23.** Consol's claim that the regulations change the terms of the Lease also fails to recognize the fundamental difference between interest provided for by contract and interest provided as damages:

A distinction exists between interest stated by the terms of a contract to be paid before its breach and interest recoverable by way of damages after a breach, although the term "interest" is often used indiscriminately to describe both amounts. Contractual interest is the creature of contract and is recoverable only as provided by its terms. When the agreement is violated, however, the non-defaulting party has sustained a wrong for which the law gives him redress by way of damages, including, in many cases, interest for retention of the funds due on breach.

22 Am.Jur.2d *Damages* § 649 (1988) (footnotes omitted). Consol breached the contract when it failed to calculate and submit the proper amount of royalties on a quarterly basis. The issue, therefore, is not necessarily what remedy the contract provides, but what remedy the law will provide to the State in light of Consol's breach. *See id.* Consol's contractual duty was to determine and submit its royalties on a timely basis. The State's constitutional and statutory duty was to then take those royalties and manage them prudently and profitably. Consol breached the contract by failing to perform its duties under the contract, which prevented the State from investing the money in the state school trust funds and thereby properly fulfilling its duty. The State is entitled to be made "whole," that is, to recover what it would have made in interest on the unpaid royalties if Consol had paid the royalties in a timely manner.

**24.** For example, we recognized in *Plateau Mining Co.* that the State had the power to audit the books and records of the plaintiffs to determine compliance, even though there was no language to that effect in the Lease. 802 P.2d at 730.

contract. *See, e.g., Lone Mountain Prod. Co. v. Natural Gas Pipeline Co.*, 984 F.2d 1551, 1561 (10th Cir.1992); *Nielsen v. O'Reilly*, 848 P.2d 664, 669–70 (Utah 1992) (section 15–1–1 establishes legal rate of prejudgment interest in breach of contract claim); *SCM Land Co. v. Watkins & Faber*, 732 P.2d 105, 108–09 (Utah 1986) (section 15–1–1 governs interest rate on prejudgment interest rate where no rate is specified by contract); *Lignell v. Berg*, 593 P.2d 800, 809 n. 14 (Utah 1979) (same); *Mont Trucking, Inc. v. Entrada Indus.*, 802 P.2d 779, 782 (Utah Ct.App. 1990) (Utah law provides that section 15–1–1 governs interest in all contracts when parties have not specified rate); *Breuer–Harrison, Inc. v. Combe*, 799 P.2d 716, 731–32 (Utah Ct.App.1990) (section 15–1–1 governs prejudgment interest where contract does not specify interest rate); *Ringwood v. Foreign Auto Works, Inc.*, 786 P.2d 1350, 1358 (Utah Ct.App.1990) (same); *Price–Orem v. Rollins, Brown & Gunnell*, 784 P.2d 475, 482 (Utah Ct.App.1989) (same); *Mason v. Western Mortgage Loan Corp.*, 754 P.2d 984, 987 n. 2 (Utah Ct.App.1988) (same); *Davies v. Olson*, 746 P.2d 264, 270 (Utah Ct.App.1987) (same).[1]

The Utah Court of Appeals recently addressed the very issue here presented in *Trail Mountain Coal Co. v. Division of State Lands & Forestry*, 884 P.2d 1265 (1994). In fact, *Trail Mountain* is a companion case to the present case.[2] On the basis of the same relevant facts, the court of appeals determined, in accordance with existing authority, that section 15–1–1 controls prejudgment interest when the contract is silent. The court of appeals stated in pertinent part:

> The trial court ruled that the State Land Board had no authority to unilaterally change the applicable rate of interest and to impose penalties not mentioned in the lease. We agree. As previously noted, Utah law establishes the rate of prejudgment interest "[e]xcept when parties to a lawful contract agree on a specified rate." Utah Code Ann. § 15–1–1 (1992). Trail Mountain and the Division did not agree on a specified rate of prejudgment interest, nor to the imposition of penalties for the late payment of royalties.

*Trail Mountain*, 884 P.2d at 1273. Therefore, not only is section 15–1–1 applicable to prejudgment interest generally, but there is a specific case in this jurisdiction holding that section 15–1–1 is applicable to the precise lease being interpreted in this case.

By transferring the *Trail Mountain* appeal to the court of appeals, this court authorized the court of appeals to address and answer the question, which it has now done in accordance with existing authority. *See Conder v. A.L. Williams & Assoc.*, 739 P.2d

---

1. Chief Justice Zimmerman's individualized dicta attacking this well-established line of cases is unfounded. Justice Zimmerman suggests that because the contracts were for the sale of goods (mineral rights), they are not a "loan or forbearance." Justice Zimmerman misapprehends the purpose of section 15–1–1 and prejudgment interest. Prejudgment interest is designed to compensate the nonbreaching party that finds itself, by virtue of the breach, in the position of loaning money or forbearing what is owed by the breaching party. *See* 22 Am.Jur.2d *Damages* § 82 (1988); *see also L & A Drywall, Inc. v. Whitmore Constr. Co.*, 608 P.2d 626, 630 (Utah 1980) (prejudgment interest represents interest on amount awarded *as* damages due to party's failure or delay in paying amount under contract); *Fitzgerald v. Critchfield*, 744 P.2d 301, 304 (Utah Ct. App.1987) (prejudgment interest is that interest owed on overdue debt from date debt became overdue until entry of judgment). Therefore, because of the underpayment of royalties by Consol, the State found itself in the position of loaning or forbearing money it was owed.

2. Several mining companies, including Consol and Trail Mountain, entered into leases with the Division of State Lands using the same lease form. Following an audit, the Division of State Lands notified these companies that they had underpaid their royalties. The mining companies brought separate declaratory judgment actions, seeking determinations of their rights and obligations under the lease agreement. In all cases, the trial court granted relief in favor of the mining companies. The State appealed the rulings. This court consolidated the cases and reversed and remanded for the trial court to take evidence on the interpretation of the lease agreement, among other things. *See Plateau Mining Co. v. Division of State Lands & Forestry*, 802 P.2d 720 (Utah 1990). Following a trial on remand, the trial court ruled in favor of the State. Consol and Trail Mountain filed separate appeals. This court transferred Trail Mountain's appeal to the court of appeals pursuant to rule 42 of the Utah Rules of Appellate Procedure but retained Consol's appeal.

634, 636 (Utah Ct.App.1987) (when case is transferred from supreme court, court of appeals stands in supreme "court's shoes for all purposes pertinent to the case"). In any event, *Trail Mountain* was decided in a published opinion by an appellate court of this jurisdiction, and it is now part of our common law. Until altered by this court or by the legislature, it is the law that must be followed in this jurisdiction by judges, practitioners, and the public.

Of course, this court has the power to alter the common law by overruling *Trail Mountain* and the cases cited therein. However, the overruling of existing case law should not be done lightly. *State v. Menzies*, 235 Utah Adv.Rep. 23, 1994 WL 110861 (Mar. 29, 1994). To overrule the rule of law established in earlier cases, this court should explain how it came to be "clearly convinced [1] that the rule was originally erroneous or is no longer sound because of changing conditions and [2] that more good than harm will come by departing from precedent." *Id.* (quoting John Hanna, *The Role of Precedent in Judicial Decision*, 2 Vill.L.Rev. 367, 367 (1957)). Mere disagreement with the common law "certainly does not satisfy *Menzies'* careful requirements for overruling prior case law." *White v. Deseelhorst*, 879 P.2d 1371, 1377 (Utah 1994) (Zimmerman, C.J., concurring). This court must therefore either follow existing precedent or, in a very disciplined way, overrule existing precedent so as to alter the common law. At the very minimum, *Trail Mountain* must be treated as persuasive authority. The failure to address existing precedent will "produce unacceptable indeterminacy in the law and … undermine confidence in its institutions." *State v. Thurman*, 846 P.2d 1256 (Utah 1993).

The majority does not give even lip service to *Trail Mountain* and the cases cited therein. Instead, the majority strains to avoid the operation of section 15–1–1 by engaging in a rather tortured analysis of the State's responsibilities under the Utah Enabling Act. The majority correctly indicates that the State has the responsibility to manage trust lands "for the sole benefit of the common schools and to receive 'full value' from any disposition of its school trust lands." The cases cited by the majority, however, support only the notion that the State must get "full value" *at the time it enters into a contract* for the disposition of school trust lands. For example, in *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976), the Supreme Court stated, "Full appraised value is to be determined and measured at the times of the disposition of the respective interests, and if the State receives those values at those respective times, the demands of the Enabling Act are met." *Id.* at 307, 96 S.Ct. at 918. A contract for less than fair value is to be considered simply "null and void." *Id.* at 304–05, 96 S.Ct. at 917.

In the present case, there has been no allegation that Consol leased the trust property for less than full value. In fact, the lease actually included an escalator provision to insure that the State received full value for the duration of the lease. The requirement that the State receive full value at the time of the disposition of the State's interest is a far cry from authorizing the State unilaterally to modify material terms of its existing contracts. In none of the cases cited by the majority was the state allowed to enforce a contract and, at the same time, to vary its terms.

In support of its conclusion that the Board can unilaterally modify an existing contract, the majority notes that the lease between Consol and the State is subject to the laws of Utah in existence when the lease was signed. The majority essentially points at Consol, claiming that it should have known it was taking a lease subject to the requirement that the State receive full value for any disposition of its trust lands. The majority ignores, however, the fact that section 15–1–1 was also in effect when the lease was signed. Consistent with the majority's own analysis, the lease between Consol and the State is governed by section 15–1–1. *See Lone Mountain*, 984 F.2d at 1561; *Nielsen*, 848 P.2d at 669–70; *SCM Land*, 732 P.2d at 108–09; *Lignell*, 593 P.2d at 809 n. 14; *Trail Mountain*, 884 P.2d at 1273; *Mont Trucking*, 802 P.2d at 782; *Breuer–Harrison*, 799 P.2d at 731–32; *Ringwood*, 786 P.2d at 1358;

*Price–Orem,* 784 P.2d at 482; *Mason,* 754 P.2d at 987 n. 2; *Davies,* 746 P.2d at 270.

The lease agreement was signed in 1968. Section 15–1–1, in force in 1968, provided that the statutory prejudgment interest rate in contracts was 6%. Thus, under the rules of contract formation, a prejudgment interest rate of 6% was integrated into the contract between the State and Consol. *See SCM Land,* 732 P.2d at 108–09 (rate of interest is governed by statutory rate in effect when contract was entered into); *accord Lone Mountain,* 984 F.2d at 1561. The State has no authority to modify, unilaterally and at-will, the statutory interest rate in effect when the parties entered into the contract.[3]

### The Agency Rule

The majority concedes that section 15–1–1 would apply if the Board lacked authority to modify the statutory rate of interest. The majority then erroneously concludes that the Board had such authority.

Administrative agencies possess only such rule-making authority as the legislature has expressly delegated to them. *See Crowther v. Nationwide Mut. Ins. Co.,* 762 P.2d 1119, 1122 (Utah Ct.App.1988). " 'It is well [settled] that the legislature may not delegate authority' to a Board 'to adopt rules or regulations which abridge, enlarge, extend or modify the statute creating the right or imposing the duty.' " *IML Freight, Inc. v. Ottosen,* 538 P.2d 296, 297 (Utah 1975) (quoting *McCulloch v. Ashby,* 73 N.M. 267, 387 P.2d 588 (1963)). *Crowther* held as follows:

Administrative regulations "may not conflict with the design of an Act, and when they do the court has a duty to invalidate them.... Furthermore, when an administrative official misconstrues a statute and issues a regulation beyond the scope of a statute, it is in excess of administrative authority granted." *Travelers Indem. Co. v. Barnes,* [191 Colo. 278] 552 P.2d 300, 303 (Colo.1976). It is the prerogative and re-

sponsibility of the legislature to set policy and that responsibility may not be constitutionally delegated to an agency under its rule-making authority.

*Crowther,* 762 P.2d at 1122; *see also McKnight v. State Land Bd.,* 14 Utah 2d 238, 244, 381 P.2d 726, 730 (1963) ("[R]ules and regulations of an administrative agency must conform to rather than be contrary and inconsistent with statutory law.").

The majority holds that Utah Code Ann. § 65–1–23 (1987) grants the State authority to change the statutory rate of interest and thereby to unilaterally manipulate the terms of its existing contracts. Section 65–1–23, at all times relevant to this appeal, provided as follows:

Except·as otherwise provided by law, the State Land Board shall by rules and regulations prescribe the form of the application, the form of the lease, the annual rental, the amount of royalty and the basis upon which the royalty shall be computed, *and such other details as it may deem necessary in the interest of the State.*

*Id.* (emphasis in majority opinion), *repealed by* Trust Land Management Act ch. 121, § 18, 1988 Utah Laws 548, 566. Under the majority's analysis, the emphasized language in this section provides the State with carte blanche authority to modify existing legal contracts to the State's advantage. This very argument was addressed in *Trail Mountain,* where the court of appeals expressly held:

Nor does the statutory grant of rule-making authority to the State Land Board, found in Utah Code Ann. § 65–1–23 (1986), allow the Board to change the material terms of the lease by subsequent rule. While section 65–1–23 authorizes the Board, "[e]xcept as otherwise provided by law," to establish rules and regulations prescribing the form of application, the form of lease, the amount of royalties and

---

**3.** Under the majority's analysis of this case, the State can be entitled only to what the majority defines as "full value." The majority defines "full value" as the rate the State would have earned had the money owed by Consol been invested in a manner similar to other state trust funds. The State is not, as a matter of law, entitled to the arbitrary interest set by the Board at rates as high as 22 to 24%. Under the majority's own analysis, this case must be remanded for a determination of "full value" in the context of the interest earned by other state trust funds during the period in question.

so forth, it says nothing about permitting the Board to retroactively alter existing leases. Nor does the "other details" language contemplate something as significant as a deviation from the generally prevailing statutory interest scheme. As already noted, Utah Code Ann. § 15–1–1 (1992) establishes the statutory rate for prejudgment interest in cases where the parties have not contractually agreed upon a rate.

Accordingly, we conclude that neither the lease language contemplating changes in operating rules nor the grant of authority found in section 65–1–23 provide[s] a basis for altering the monetary terms of the lease, either in terms of deviating from the statutory rate of prejudgment interest or in assessing late fees. Therefore, we deny the Division's cross-appeal seeking a higher interest rate and late fees and affirm the trial court's decision in that respect.

*Trail Mountain,* 884 P.2d at 1273.

Certainly section 65–1–23 authorizes the Board to *negotiate* a prejudgment interest rate higher than that provided by statute. If interest is not specified in the lease, however, this statute cannot reasonably be interpreted to allow the Board to change the statutory rate of interest. The plain language of the statute does not permit the agency, at any time, to promulgate rules that are inconsistent with provisions "otherwise provided by law." *Id.* An administrative rule out of harmony or in conflict with the express provisions of a statute "would in effect amend that statute." *Olson Constr. Co. v. State Tax Comm'n,* 12 Utah 2d 42, 45, 361 P.2d 1112, 1113 (1961). Therefore, even if section 65–1–23 could be construed to allow the agency to provide for prejudgment interest when not provided by contract, the agency rule cannot "trump" section 15–1–1. *See Crowther,* 762 P.2d at 1122.[4]

Section 15–1–1 would control, in any event, because it is the most specific statute. *See*

*State v. Burnham,* 87 Utah 445, 449, 49 P.2d 963, 965 (1935) ("It is a general rule of statutory construction that where two statutes treat the same subject-matter, the one general and the other [specific] in its provisions, the [specific] provision controls."); *accord Cannon v. Gardner,* 611 P.2d 1207, 1209 (Utah 1980); *Floyd v. Western Surgical Assoc.,* 773 P.2d 401 (Utah Ct.App.1989). The statutes relied upon by the majority do not even mention interest rates.

### Impairment of Contract

Consol correctly argues that if the Board can modify its existing contracts, then the statutes and rules relied upon run headlong into constitutional prohibitions. The Federal Constitution provides for the protection of consensual contractual rights by stating that no State shall pass any "law impairing the obligations of contracts." U.S. Const. art. I, § 10. Utah's Constitution similarly states that no "law impairing the obligations of contracts shall be passed." Utah Const. art. I, § 18.

It is a fundamental principle of constitutional law that a state may not pass a law altering the nature and legal effect of an existing contract to the prejudice of either party to the contract. *See Pulos v. James,* 261 Ind. 279, 302 N.E.2d 768, 775 (1973). It is likewise a fundamental principle of constitutional law that the state may not pass a law altering a contractual remedy when the remedy is material to the contract. *Kirkman v. Bird,* 22 Utah 100, 111–12, 61 P. 338, 339–40 (1900) ("The remedy subsisting in a state when and where a contract is made and is to be performed is a part of its obligation, and any subsequent law of the state which so affects that remedy as substantially to impair and lessen the value of the contract is forbidden by the constitution, and is therefore void.").

"Any law which changes the intention and legal effect of the original parties, giving to

---

4. The majority also relies on Utah Code Ann. § 65A–1–2 (1993), a provision first passed by the legislature long after the lease was signed and the rule was promulgated. The majority argues that this statute clarifies that the "Board had expansive authority and power to 'adopt rules'

and policies consistent with the proper administration of state school trust lands." However, like section 65–1–23, section 65A–1–2 does not authorize the Board to change the statutory rate of interest.

one a greater or the other a less interest or benefit of the contract, impairs its obligations." 16A Am.Jur.2d *Constitutional Law* § 695 (1979) (citing *Kentucky Util. Co. v. Carlisle Ice Co.*, 279 Ky. 585, 131 S.W.2d 499 (1939)). "Law" for purposes of impairment has been defined to mean "[a]ny enactment, from whatever source it originates, to which a state gives the force of law." *Id.* § 699. This includes "acts of the legislature, municipal ordinances passed pursuant to legislative authority, rules and orders by an instrumentality of the state exercising delegated authority, and state constitutions and constitutional amendments." *Id.* § 701. Absent a compelling state interest, the state may not pass a law impairing its own contracts with private parties. *Id.* § 694.[5]

In the present case, the parties did not specify a prejudgment interest rate. Because the parties were silent on the issue of prejudgment interest, as indicated by existing authority, including *Trail Mountain,* section 15–1–1 was incorporated by operation of law into the contract.[6] This provision in the contract was material in that it set the penalty Consol was to be charged if it became delinquent in its royalty payments. At the interest rate specified by section 15–1–1, Consol would owe the State $460,725.38 in unpaid prejudgment interest, but *according* to the majority, under the Board's later-promulgated rule governing prejudgment interest, Consol would owe $1,473,856.09 in prejudgment interest. The majority has allowed the State, through the Division of

State Lands, to impair a material remedy and obligation in its own contract with Consol to its own benefit of over one million dollars. Such an impairment of contract is prohibited by the Federal and State Constitutions.[7]

## Conclusion

In accordance with existing authority, including *Trail Mountain,* I would hold that section 15–1–1 governs the prejudgment interest rate in the contract between the State and Consol. The State may not unilaterally modify the terms of its own contract to its own benefit. The majority's holding impairs the contract between the State and Consol in violation of both the Federal and State Constitutions.

HALL, Justice, did not participate herein; BENCH, Court of Appeals Judge, sat.

STEWART, Associate Chief Justice, does not participate herein.

---

5. Assuming, but not conceding, that the state can constitutionally impair obligations like the one in the instant case, such ruling can be given only prospective application. *See, e.g.,* 16A Am.Jur.2d *Constitutional Law* § 689 (1979) (statute tending to impair contractual obligations, if assumed to be valid, may not be given retroactive effect so as to impair contracts already in existence without violating Constitution).

6. The majority attempts to avoid the operation of section 15–1–1 by claiming that there is a distinction in this case between "interest provided for by contract and interest provided as damages." The majority argues that the State is entitled to expectancy damages—the amount that the State "would have made in interest on the unpaid royalties if Consol had paid the royalties in a timely manner." Whatever the majority may choose to call the type of damages applicable in

this case, the only damages recoverable "for a breach of the obligation to pay money is the amount due, with interest thereon at the legal rate. The interest is technically damages awarded for the delay in payment." 22 Am.Jur.2d *Damages* § 82 (1988). This type of damage has consistently been defined by our courts as prejudgment interest. *See, e.g., L & A Drywall, Inc. v. Whitmore Constr. Co.*, 608 P.2d 626, 630 (Utah 1980); *Fitzgerald v. Critchfield*, 744 P.2d 301, 304 (Utah Ct.App.1987).

7. When, in 1981, section 15–1–1 was amended to increase the prejudgment interest from 6 to 10%, the legislature expressly provided that the amendment does not affect contracts entered into before 1981. Utah Code Ann. § 15–1–1(3). The legislature apparently recognized that it could not constitutionally modify contracts then in existence.